**UNITED STATES of America, Appellee,**

v.

**Stephen Scott CROOKER, Defendant, Appellant.**

**No. 83–1551.**

United States Court of Appeals, First Circuit.

Argued Jan. 6, 1984.

Decided March 20, 1984.

Kenneth Neiman, Holyoke, Mass., by appointment of the Court, with whom Fierst & Neiman, Northampton, was on brief, for defendant, appellant.

C. Brian McDonald, Asst. U.S. Atty., Boston, Mass., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before CAMPBELL, Chief Judge,

**890**

BREYER, Circuit Judge, and PETTINE,* Senior District Judge.

BREYER, Circuit Judge.

Stephen Crooker, the appellant, pled guilty to a federal charge of unlawful possession of firearms, 18 U.S.C. § 922(h)(1) (forbidding previously convicted felon to possess firearms). Three weeks later the court sentenced him to a prison term of three years—to begin when he finished serving a pre-existing sentence for a state crime. About one month after sentencing, appellant moved to withdraw his guilty plea under Fed.R.Crim.P. 32(d)—a rule that allows the court to set aside such a plea "to correct manifest injustice." Appellant based his claim of "manifest injustice" upon an accompanying affidavit, signed by his brother, Michael Alan Crooker, which set forth facts that, in appellant's view, showed the existence of a previously unknown entrapment defense. The federal district court denied the Rule 32(d) motion without a hearing. Stephen Crooker appeals from this denial.

■ We believe that one of appellant's arguments has merit. In *United States v. Fournier*, 594 F.2d 276, 279 (1st Cir.1979), we wrote that, if a Rule 32(d) motion

alleges facts which, if true, would entitle [the petitioner] ... to relief, the Court must hold a plenary hearing.... That is to say that the district court may deny a hearing so long as it does so on the basis of the facts as alleged by the defendant and so long as it would be within the court's discretion to do so were the facts alleged by the defendant true.

Although the parties evidently overlooked the *Fournier* case, its standard applies to this motion and requires a remand for a hearing.

■ The facts "as alleged by the defendant" are contained in Michael Crooker's affidavit (reprinted in Appendix A). In essence, it claims that 1) Michael Crooker is a heroin addict; 2) Police Chief Wolfe told him at some point that he "could get 'dope money' for guns;" 3) Chief Wolfe told Michael that he wanted him to convince Stephen to buy guns unlawfully from a person named Gilligan; 4) Chief Wolfe told Michael that federal agents would allow him to pay Michael if, but only if he would "set up" Stephen; 5) Michael nagged and browbeat a reluctant Stephen into buying the firearms; 6) Chief Wolfe subsequently gave Michael "$120 in cash for heroin for the set-up of my brother."

These facts, if true, would show that Michael solicited Stephen to commit the crime; they would indicate Stephen's unreadiness to commit the crime without the solicitation; and Chief Wolfe's involvement would make the criminal conduct "the product of the *creative* activity" of law enforcement officials. *E.g., Sherman v. United States*, 356 U.S. 369, 372, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958); *Sorrells v. United States*, 287 U.S. 435, 441, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932); Model Penal Code § 2.13 (Tentative Draft 1962). Thus, if these factual allegations are true, they likely show entrapment; and, they show it with sufficient clarity that the government, allegedly possessing the knowledge, would have had to disclose the information to Stephen even without a request for it. *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976). The later revelation of such "facts" would make out the "manifest injustice" needed to set aside a guilty plea.

■ Of course, the trial judge did not believe Michael's affidavit told the truth. Chief Wolfe provided an affidavit that denies every essential fact alleged. (See Appendix B.) We have held that a defendant's allegations need not be taken as true to the extent that they are "contradicted by the record or are inherently incredible and to the extent that they are merely conclusions rather than statements of fact." *Otero-Rivera v. United States*, 494 F.2d 900, 902 (1st Cir.1974); *Domenica v. United States*, 292 F.2d 483, 484 (1st Cir.1961). But, we believe that, in this instance, these exceptions do not apply; and *Fournier*

---

* Of the District of Rhode Island, sitting by designation.

does not allow the district court to resolve this type of factual dispute without a hearing.

The government makes several arguments designed to show that a hearing is not necessary. First, it argues that a presentence memorandum, submitted by Stephen, shows that whatever facts Stephen now knows he knew about prior to entering the guilty plea. The memorandum, however, concededly says nothing of Chief Wolfe's alleged involvement; it does not suggest Stephen knew about any allegation of that involvement; and, without that involvement, there is no plausible defense of entrapment.

Second, the government argues that Michael was a defense witness; thus, the defense could have found out about his Wolfe allegations before entering the guilty plea. The evidence of strong hostility between Michael and Stephen, however, makes plausible the defense claim that Michael did not produce these allegations until after Stephen's sentencing.

Third, the government states that the trial judge knew Michael from a trial at which he was convicted seven years before; the court may have known the police chief by his reputation; and Michael is currently in prison. There is no point, it says, in requiring a "swearing contest" between these two—a contest, the outcome of which may have been obvious to the district court in advance. Cf. United States v. Martorano, 663 F.2d 1113, 1119 (1st Cir.1981). These facts, in and of themselves, however, do not show that the allegations are "inherently incredible" or that a hearing would be pointless. Reputation as an indication of truth is not a substitute for cross examination. The government directs us to nothing else in the record that demonstrates that the allegations must be false or that they would not constitute grounds for setting aside the plea if true. We note that the allegations here were made, not in defendant's pleadings, but in an affidavit signed under penalties of perjury. See 28 U.S.C. § 1746. The existence of perjury laws, with their strict penalties, along with

the exceptions as stated in *Otero-Rivera*, should prevent *Fournier* from creating a deluge of unnecessary district court proceedings. We have no evidence of any such serious problem to date.

We find appellant's remaining claims either factually dependent upon this one or without merit.

*For the reasons stated, the judgment of the district court is vacated and the case is remanded for proceedings consistent with this opinion.*

### APPENDIX A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| United States of America ) | |
| ) | |
| v. ) | CR 83–27–F |
| ) | |
| STEPHEN SCOTT CROOKER ) | |

### AFFIDAVIT OF MICHAEL ALAN CROOKER

MICHAEL ALAN CROOKER, duly sworn, deposes and says:

(1) I am a federal prisoner incarcerated at F.C.I. Otisville located in Otisville, New York serving time for a parole violation.

2. In February of 1982 I became addicted to heroin and it developed, as of October of 1982, into a $400 a day habit.

3. One afternoon on or about October 22, 1982 I received a call from Teddy Gilligan who explained to me that he had stolen guns and wanted to sell them. I explained to him that I hadn't any money and he suggested that I contact my brother Stephen and see if he wanted to buy the guns.

4. Instead, I contacted Chief of Police Charles Wolfe of Southwick, Massachusetts and told him of my conversation with Gilligan. The reasons for this were twofold: First, Chief Wolfe had explained to me in earlier dealings that I could get "dope money" for guns and secondly, Gilligan had stolen money from me on an earlier transaction in 1982.

5. Chief Wolfe wanted me to transact the deal through my brother Stephen but I

refused at that point. I wanted $300 to pay for heroin from Wolfe in exchange for setting up Gilligan but Wolfe said he'd have to check with "the boys" (which I took to mean the Alcohol, Tobacco and Firearms agents).

6. Wolfe called back and explained that the deal had to be set up through my brother Stephen and that the feds especially wanted him. This way was the only way the deal could be set up. I refused. He told that the deal was off then if I didn't do it that way. Wolfe also went to speaking about how Stephen had screwed me over in 1977 and why shouldn't I do it back to get even, and how it wouldn't really harm Stephen because he already had numerous state court cases and it really wouldn't harm him but would help the law enforcement officials, etc. and I needed heroin money sobad because I was sick from withdrawal symptoms that Wolfe talked me into setting Stephen up, too.

7. I found out where Stephen was playing cards through his wife, Pamela, and I called Leo's bar and paged Stephen from the card game. I told him there were guns to be had for $120 which was an excellent deal and was Stephen interested and Stephen replied that he wasn't interested and he was playing poker and he hung up abruptly saying he had to get back to the game. I called him back about fifteen minutes later and nagged him into buying the firearms as an investment for me because I could resell them at a profit in the future. He again declined but finally relented and agreed after I browbeated him about it for about ten minutes on the phone.

8. I called back Gilligan and told him to see Stephen at Leo's bar and described Stephen to him as Gilligan had only seen Stephen in the past once about five years previous to this time. Then I called Chief Wolfe and told him about the anticipated bar meeting and anticipated gun transaction.

9. I found out later the federal agents and various law enforcement personnel staked out Leo's bar parking lot too late and the gun purchase had already been consumated by my brother. Wolfe called me around midnight that evening to tell me that Gilligan had been "pinched" on an old traffic warrant before the deal could be made and so I was entitled to no money. He then told me to set the deal up for the next morning.

10. By that time, I was extremely sick and suffering immensely from heroin withdrawal and I called Stephen the next morning to find, to my utter astonishment, that the gun deal had indeed occurred and that Stephen now possessed the firearms. He asked me if I wanted them kept at my house and I said no and he said he didn't want them at his house either. I then suggested he stash them at our father's house and he agreed. I asked him when he would be at our father's house and he stated "in about a half hour".

11. I immediately called Chief Wolfe to tell him this and he apparently called Richard Dotchin of the Alcohol, Tobacco and Firearms division of the Treasury Department who staked out my father's house and took photographs as Stephe and I met and brought the guns into my father's house.

12. Later that morning I met Chief Wolfe on Coes Hill Road in Southwick, Massachusetts where Wolfe lives and he gave me $120 in cash for heroin for the set-up of my brother. I bought four bags of heroin with the money that same morning.

13. Stephen was indicted in January of 1983 for receipt of a firearm (3 counts) by a convicted felon.

Dated: *May 24, 1983*

*Michael Alan Crooker*

Michael Alan Crooker

*I declare under the penalty of perjury that the foregoing is true and correct. 28 USC 1746*

~~Sworn to before me this~~ . ~~day of May, 1983.~~ *Michael Alan Crooker*

----

~~Notary Public~~

## APPENDIX B

### AFFIDAVIT

I, Charles Wolfe, Chief of Police for the town of Southwick, Massachusetts, do hereby depose and state as follows:

1. On or about the week of October 18, 1982, I received a telephone call from Michael Crooker. Michael advised me that he wanted to make a deal concerning a criminal charge which he was facing in Hampden County Superior Court. He said he did not want to go to jail. Michael told me that he had information concerning his brother Stephen Crooker. According to Michael, Stephen had manufactured a white powder substance which could kill people. Michael wanted to give this information to the Hampden County District Attorney's Office. I agreed to contact the District Attorney's Office.

2. Following my conversation with Michael, he gave an affidavit to the Hampden County District Attorney's Office concerning criminal activity of his brothers, Stephen and Peter. On or about October 22, 1982, Michael turned over to me a sample of the white substance he had previously described. This substance was later reported to me to have been a very toxic poison known as ricin.

3. I had no conversation with Michael Crooker at any time in October, 1982 in which I promised any money or deal to Michael. I merely referred him to the District Attorney's Office and arranged for him to meet the appropriate Assistant District Attorney.

4. I have never discussed with Michael Crooker his alleged heroin habit, or his need for money to support this habit. I have never told Michael Crooker that he could get "dope money" for guns.

5. At no time did I advise Michael Crooker to arrange for Stephen Crooker to purchase guns. I never advised or instructed Michael concerning the purchase of guns for which Stephen pled guilty. Michael called me on every occasion on which we discussed the purchase or possession of these guns. I never reminded Michael that his brother, Stephen, had testified against him in 1977.

6. On or about October 27, 1982, Michael contacted me and advised me that Stephen Crooker was going to purchase stolen guns from someone who was not identified by name to me.

7. Michael Crooker never asked me for money in exchange for information concerning Stephen. Michael's only interest expressed to me was to avoid going to jail.

8. Michael Crooker called me a second time on or about October 27, 1982, and advised me of the planned meeting between Stephen and Theodore Gilligan at which Stephen was to buy stolen guns from Gilligan. I notified agents of the Bureau of Alcohol, Tobacco & Firearms.

9. Later in the evening of October 27, 1982, Michael called me to complain that Stephen had not been arrested. I did not tell Michael that he was not entitled to money because the deal between Gilligan

and Stephen Crooker apparently had not occurred. Michael had never asked for nor been promised money. I did not instruct Michael to set the deal for the following day. The matter, by that time, was the responsibility of the Bureau of Alcohol, Tobacco & Firearms.

10. On or about October 28, 1982, Michael Crooker called me to report that Stephen Crooker had purchased the guns from Gilligan and was taking them to his father's home that morning. I notified the Bureau of Alcohol, Tobacco & Firearms.

11. On October 28, 1982, Michael Crooker asked me for money for gas because he had used his car "chasing around" in his efforts to gather information about Stephen. I gave Michael $20.00 for gas and later recorded the payment in my records. No other payment was promised or made to Michael Crooker.

12. Between October 28, 1982, and November 5, 1982, Michael Crooker called me several times to ask why the stolen guns had not been seized from his father's home. I explained that at his request I was attempting to avoid disclosure of his identity.

13. Until this affidavit I have preserved the confidentiality of Michael Crooker's identity.