785 F.2d 1
 19 Fed. R. Evid. Serv. 1481
 UNITED STATES of America, Appellee,
v.
Assada ABOU-SAADA, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Milad K. EL-DEBEIB, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Antonious TANNOUS, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Yacoub FAYAD, Defendant, Appellant.
 Nos. 85-1101 to 85-1104.
 United States Court of Appeals,
First Circuit.
 Argued Nov. 12, 1985.
Decided Feb. 27, 1986.
As Amended on Denial of Rehearing March 21, 1986.
 
 Nicholas A. Abraham, with whom Abraham-Hanna, P.C., was on brief, for defendant, appellant Tannous.
 Charles Rankin, for defendant, appellant El-Debeib.
 Andrew Good, with whom Silverglate, Gertner, Baker, Fine & Good, was on brief, for defendant, appellant Fayad.
 E. Sydney Hanlon, Asst. U.S. Atty., with whom William F. Weld, U.S. Atty., was on brief, for appellee.
 Before CAMPBELL, Chief Judge, BREYER, Circuit Judge, and WYZANSKI,* Senior District Judge.
 BREYER, Circuit Judge.
 
 
 1
 The government charged the four defendants in this case with being part of an international heroin importing conspiracy. The jury convicted them of conspiracy to possess (with intent to distribute) fifteen pounds of heroin, 21 U.S.C. Sec. 846, and of a related "interstate commerce" charge, 21 U.S.C. Sec. 843(b). All four (Assada Abou-Saada, Milad El-Debeib, Antonious Tannous and Yacoub Fayad) appeal raising various arguments. With one exception, we find these arguments legally inadequate; hence, we affirm the convictions of Abou-Saada, Tannous, and Fayad. We remand El-Debeib's case for further proceedings.
 
 
 2
 * We first set forth several of the key facts in this case, primarily for what they tell us about Abou-Saada's role. This role will become important in respect to one of appellant Tannous' arguments which we will discuss at pp. 9-10 infra. In setting forth the facts, we read the record in a light most favorable to the government. United States v. Quejada-Zurique, 708 F.2d 857, 859 (1st Cir.), cert. denied, 464 U.S. 855, 104 S.Ct. 173, 78 L.Ed.2d 156 (1983).
 
 
 3
 * The Canadian Investigation
 
 
 4
 On March 9, 1984, in Toronto, Canada, an undercover agent of the Royal Canadian Mounted Police (RCMP), Corporal Gerald Froud, bought 100 grams of heroin from Remonda Bassett. Froud wanted to catch Bassett's suppliers. When he met with her again on March 13, he complained about the quality of the 100 grams received. He insisted on meeting with her suppliers, and he discussed buying an additional four kilograms of heroin. After placing wiretaps on Bassett's phone, the RCMP heard her relay the four kilogram order to Elias and Marie Njeim in Montreal. The RCMP then began to tap the Njeims' phone as well.
 
 
 5
 Froud went with Bassett to Montreal on March 19. He met with the Njeims, he paid them $30,000 for the 100 grams, he discussed an interim purchase of 250 grams, and he agreed to buy the additional four kilograms for $600,000. During the trip, Froud heard Bassett say that the Njeims were "dealing with the main person in Boston," who received drugs from an overseas supplier whom she (Bassett) knew.
 
 
 6
 Froud met with Bassett again in Toronto on March 30. Bassett offered to sell him yet an additional 200 grams. Later that day, the RCMP heard Bassett's husband call Assad Abou-Saada in Lebanon and ask for four kilograms of heroin. After bargaining over the price, Abou-Saada agreed to deliver the four kilograms of drugs to the United States for $150,000.
 
 
 7
 On April 1, Bassett received a call from Yacoub Fayad in Boston. During the conversation, Fayad made clear that he was the Njeims' regular heroin supplier, that he would supply the extra 200 grams destined for Froud, and that he did not want to meet her customers. He said, "No, no, no, if they are not from our people I won't meet with them. I will meet with you, me and you...." Subsequently, the RCMP overheard several conversations among Bassett, Fayad and the Njeims discussing the quality and price of the 200 grams, in which it became apparent that Marie Njeim and Fayad were attempting to doublecross both each other and Bassett.
 
 
 8
 On April 5, Froud returned to Montreal with Bassett. He paid for, and received, the 200 grams. Froud then travelled with Bassett to Massachusetts, where Bassett met alone with Fayad at the Harvard Street Garage in Medford (which Fayad owned). Afterwards Bassett told Froud that "everything was in place" for the four kilogram shipment.
 
 B
 Boston: Pre-Delivery
 
 9
 The RCMP kept the United States Drug Enforcement Agency informed about these events. Consequently, the DEA began to watch Fayad's Harvard Street Garage. On May 3 (after Bassett's meeting with Fayad in Boston), the DEA obtained a warrant allowing it to tap the phones at the garage and at Fayad's residence. Two days later, the DEA overheard Abou-Saada call Fayad from Lebanon and tell Fayad that he would soon arrive in Boston. They arranged to meet. On May 10 the DEA overheard Abou-Saada tell Fayad that he had arrived in Boston and was staying at the Charles River Motel. The DEA began to watch Abou-Saada who communicated frequently with Fayad from that point on.
 
 
 10
 On Tuesday, May 15, Abou-Saada told Fayad that the "shipment" would arrive Thursday. In fact, the next day (Wednesday), two crates arrived at Logan Airport in Boston addressed to a fictitious address near Fayad's garage. They contained china and fifteen pounds of heroin packed between the cardboard dividers separating the dishes.
 
 
 11
 During the next few days Abou-Saada told Fayad that he believed government agents were watching him; Marie Njeim told Froud that the four kilograms of heroin had arrived; Fayad told Bassett that the drugs had arrived but could not be delivered; and Marie Njeim then told Froud that there was a delay and he should call again in fifteen days to a month.
 
 C
 The Delivery
 
 12
 On May 30, a skycap at Logan Airport told federal agents that two women had tried to bribe him to smuggle two packages (the ones just described) past customs. The agents seized the packages and found the heroin inside. They arrested the women, Sara Green and Judith Limentani (defendant El-Debeib's ex-wife). They informed the women of their Miranda rights. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). They then asked the women to help make a "controlled delivery," i.e., to deliver the packages as if nothing had happened while the DEA watched. The women agreed.
 
 
 13
 The two women took the packages (the DEA had removed most of the heroin) and they tried to deliver them to Abou-Saada at a Boston motel. Abou-Saada, however, did not keep his appointment with the women. The RCMP overheard Abou-Saada tell Marie Njeim that El-Debeib had told him to pick up the drugs, but that someone else had told him that agents were watching the motel.
 
 
 14
 The DEA decided to try again. They took the packages and put them in a locker in Boston's Back Bay bus terminal. They gave the key to Limentani, and told her to await Abou-Saada's further delivery instructions. In the meantime, the DEA began to watch Limentani's ex-husband, El-Debeib. They noticed El-Debeib talk to a gasoline station attendant (defendant Tannous) on two occasions. And, they also continued to watch the Harvard Street Garage.
 
 
 15
 The next day (May 31), the DEA noticed that El-Debeib was driving his taxi near the bus terminal. Believing that he had come to pick up the packages, they stopped him; and, they found that he had the key to the locker with the packages. The DEA did not arrest El-Debeib, but they read him Miranda warnings; and, they asked him to cooperate by continuing with a "controlled" delivery. El-Debeib agreed. The DEA agents then placed the packages in El-Debeib's taxi.
 
 
 16
 The DEA agents watched El-Debeib drive to Harvard Square in Cambridge, Massachusetts, get out of his taxi, and talk to another taxi driver whom he met there. He and the other taxi driver then each returned to their taxis and drove off to the parking lot of a nearby Holiday Inn. The agents also saw Abou-Saada and Tannous sitting in a white Pontiac parked in the Square. They noticed that when El-Debeib arrived, Tannous (who was sitting in the driver's seat) pointed to El-Debeib, apparently for Abou-Saada's benefit.
 
 
 17
 The two men (Tannous and Abou-Saada) watched while El-Debeib and the other taxi driver spoke. When El-Debeib and the second taxi driver drove to the Holiday Inn, Tannous and Abou-Saada drove off in the opposite direction. The DEA agents then arrested El-Debeib and the other driver (who fled when the DEA appeared) at the Holiday Inn. Other DEA agents stopped Tannous and Abou-Saada on Memorial Drive in Cambridge and arrested them.
 
 
 18
 Although the government presented additional incriminating evidence against some of the defendants, this outline of the facts is sufficient for the purposes of these appeals.
 
 II
 El-Debeib
 
 19
 * El-Debeib notes that, after the trial, he told the district court that a previously unavailable witness, Judith Limentani, was then willing to testify that the government had promised El-Debeib immunity in return for his cooperation. He argues that that district judge, after reading her affidavit, should have granted him a new trial, or, at least, held an evidentiary hearing to decide whether or not the government made such a promise. We agree that the court ought to have held the hearing.
 
 
 20
 The relevant background is as follows: On December 17, 1984, the tenth day of trial, El-Debeib filed a written motion asking the court to dismiss the indictment, in part because the government did not tell the grand jury that "federal law enforcement agents" assured Judith Limentani that "if she used Milad El-Debeib to complete the controlled delivery, ... [he would] not be charged ... which assurances she conveyed" to El-Debeib. The district court denied the motion the same day.
 
 
 21
 The district court had previously heard defense attorneys question the government agents involved outside the presence of the jury (apparently as part of a voir dire looking towards an entrapment defense). The court had also heard counsel try to present Ms. Limentani's testimony. But, Limentani invoked the Fifth Amendment, refusing to testify because she had not yet been sentenced in a related proceeding before another judge. Thus, the district court, when it denied El-Debeib's motion, had before it only the agents' testimony which made no reference to any such promise.
 
 
 22
 After Limentani was sentenced, El-Debeib asked the court to hear her testimony. His (post-trial) request for an evidentiary hearing was accompanied by an affidavit from Limentani, in which, she says,
 
 
 23
 I indicated to [DEA Special] agent [John] Costanzo that I would be willing to ask Milad El-Debeib to try to locate [Abou-Saada] only if the Federal authorities agreed not to prosecute Milad El-Debeib. Agent Costanzo agreed that if Milad El-Debeib were used, he would not be arrested or prosecuted.... That morning [May 31, 1984], because of my condition [heroin withdrawal] and my inability to effect a controlled delivery of the package to [Abou-Saada], I told Milad El-Debeib the events of the previous day and asked him to complete my part of the controlled delivery of the two packages to [Abou-Saada]. I assured Milad El-Debeib that he would not be arrested or prosecuted and indicated to him that John Costanzo of the DEA had assured me that Milad El-Debeib would not be arrested or prosecuted.... During Milad El-Debeib's absence I called DEA agent Pat Meahl. Ms. Meahl indicated to me that I should give the key to the locker to Milad and have him complete the controlled delivery. I was concerned about Milad El-Debeib being arrested and asked DEA agent Pat Meahl if he would be arrested and prosecuted. She indicated to me that he would not be. I then asked for her supervisor's assurances of the same. DEA agent John Costanzo spoke to me over the telephone and indicated that Milad El-Debeib would not be arrested or prosecuted if he effected a controlled delivery of the package.
 
 
 24
 In our view, the district court should have granted El-Debeib's request that it hear from Ms. Limentani before deciding whether her allegations were true or false, even though the request was made after El-Debeib's trial was over.
 
 
 25
 First, the trial was just over. The district court would have heard from Limentani had she been willing to testify on December 17. Her testimony became available only three weeks later--and before final sentence was passed. The hearing would not involve the jury. Second, the factual question--whether or not the agents made the promise--is important. If the agents made such a promise, the district court would, in all likelihood, wish to reopen the case, either to dismiss the indictment or to fashion other appropriate relief. United States v. Carrillo, 709 F.2d 35, 37 (9th Cir.1983); In re Snoonian, 502 F.2d 110, 112 (1st Cir.1974); see also Santobello v. New York, 404 U.S. 257, 263, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971); United States v. Garcia, 698 F.2d 31, 37 (1st Cir.1983); cf. United States v. Hamilton, 559 F.2d 1370, 1373 (5th Cir.1977). Third, Limentani's affidavit is not inherently incredible, cf. United States v. Crooker, 729 F.2d 889, 890-91 (1st Cir.1984). In fact, the agents agree they made certain promises to Limentani, though not necessarily the promises she asserts. Fourth, the trial judge had no opportunity to assess Limentani's credibility at trial. Cf. United States v. Ward, 544 F.2d 975, 976 (8th Cir.1976) (per curiam) (necessity for a hearing diminished where trial judge earlier saw and heard witness). Fifth, the government did not submit affidavits from the agents denying Limentani's factual assertions. Remmer v. United States, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954) (per curiam). The earlier testimony of the agents contains no specific outright denial. Sixth, we have no reason to doubt that El-Debeib tried to obtain Limentani's testimony earlier and her failure to testify was not his fault.
 
 
 26
 District courts need not always hold hearings on disputed matters of fact arising from post-trial motions; see, e.g., United States v. Nace, 561 F.2d 763, 772 (9th Cir.1977) (trial court has discretion to decide factual issue raised after trial on affidavits); United States v. Kearney, 682 F.2d 214, 219 (D.C.Cir.1982) (same). Such issues are often properly decided on the basis of affidavits. See United States v. Wright, 625 F.2d 1017, 1018-19 (1st Cir.1980); United States v. Martorano, 663 F.2d 1113, 1119 (1st Cir.1981), cert. denied, 460 U.S. 1011, 103 S.Ct. 1249, 1250, 75 L.Ed.2d 479 (1983). But, given the combination of six circumstances we have outlined, we believe a hearing before the judge--giving him an opportunity to assess credibility--is appropriate here. See Remmer v. United States, 347 U.S. at 229-30, 74 S.Ct. at 451; United States v. Mitchell, 602 F.2d 636, 639 (4th Cir.1979); Lyles v. United States, 272 F.2d 910, 912 (5th Cir.1959). Compare United States v. Crooker, 729 F.2d 889 (1st Cir.1984) with United States v. Fournier, 594 F.2d 276 (1st Cir.1979). Should the court decide the factual question in the government's favor, the matter is at an end. Should it decide against the government, it can then determine appropriate relief in light of the factual circumstances revealed. Compare Government of Virgin Islands v. Scotland, 614 F.2d 360, 365 (3d Cir.1980) (protecting reliance interest of defendant only). See Santobello v. New York, 404 U.S. at 263, 92 S.Ct. at 499; see also Mabry v. Johnson, 467 U.S. 504, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984).
 
 B
 
 27
 El-Debeib argues that the district court should have suppressed the facts of the "controlled delivery," which the government introduced into evidence against him. El-Debeib says that it is 'fundamentally unfair,' and, therefore, a violation of the Due Process Clause of the Fifth Amendment, for the government to use against him what the government had learned only as a result of his voluntary cooperation. He cites as support Rochin v. California, 342 U.S. 165, 72 S.Ct 205, 96 L.Ed 183 (1952) (due process prevents state's forcible extraction of contents of defendant's stomach to gather evidence), and also United States v. Romano, 583 F.2d 1, 7 (1st Cir.1978). On the facts of this case, however, we can find no such basic unfairness.
 
 
 28
 Before obtaining El-Debeib's cooperation, government agents told El-Debeib he was a suspect. They read El-Debeib a standard statement of his constitutional rights. El-Debeib understands English and said he understood those rights; he shows no compulsion. Had he confessed, his confession would have been admissible. North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). We find no other circumstance suggesting that the government took unfair advantage of him. Cf. Tague v. Louisiana, 444 U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980) (per curiam). With one possible exception, treated separately in part IIA above (see pp. 5-7, supra), the record contains no evidence of a government promise not to prosecute El-Debeib, nor evidence of any justified reliance on such a promise. This absence of reliance on broken government promises distinguishes the cases El-Debeib cites. Cf. Rowe v. Griffin, 676 F.2d 524, 528 (11th Cir.1982) ("[O]nce the defendant's good faith compliance with the terms of the [immunity] agreement is established, the state must perform on its side and any attempt by the state to breach the agreement is per se a bad faith prosecution"); Mobley ex rel. Ross v. Meek, 531 F.2d 924 (8th Cir.), rev'd sub nom. Hutto v. Ross, 429 U.S. 28, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976) (admissions, made after plea bargain later disavowed by state, suppressed by Court of Appeals). In fact, this record suggests that El-Debeib's decision to cooperate simply reflected his hope for favorable treatment by prosecutor and judge. And, the trial court gave El-Debeib a lighter sentence than his co-defendants. Unless defendant shows the promise described in Section IIA was made, then given this record, the defendant will not have shown that introduction of evidence obtained through his cooperation was "fundamentally unfair."
 
 C
 
 29
 El-Debeib also complains about the admission of certain evidence which he says is hearsay. He adds that the co-conspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E), is not available, for he had withdrawn from the conspiracy (and was cooperating with the government) when the hearsay statements were made. United States v. Smith, 623 F.2d 627, 631 (9th Cir.1980); United States v. Mardian, 546 F.2d 973, 978 n. 5 (D.C.Cir.1976) (citing cases). He makes three separate claims.
 
 
 30
 First, El-Debeib attacks the admission of evidence of conduct by third parties. This conduct includes a) the act of the four conspirators meeting in Harvard Square; b) the fact that a conversation took place between El-Debeib and the second taxi driver in Harvard Square; c) the action of El-Debeib and the other taxi driver travelling to the Holiday Inn; and d) the fact that the second taxi driver fled when the DEA agents appeared. The Federal Rules of Evidence do not consider third party conduct hearsay, however, unless it was intended as a statement--a rather unlikely circumstance that would presuppose an elaborate charade intended to "frame" El-Debeib. See Fed.R.Evid. 801 & advisory committee note (a). United States v. Hensel, 699 F.2d 18, 31 (1st Cir.), cert. denied, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983); cf. United States v. Brock, 667 F.2d 1311, 1315 n. 2 (9th Cir.1982), cert. denied, 460 U.S. 1022, 103 S.Ct. 1271, 75 L.Ed.2d 493 (1983). Defendant does not argue that this is the case.
 
 
 31
 Second, El-Debeib objects to the introduction against him of his own pointing to the second taxi driver. This conduct, while clearly assertive, is a party admission. Hence, it is not hearsay. Fed.R.Evid. 801(d)(2)(A).
 
 
 32
 Third, El-Debeib complains of the act of Antonious Tannous pointing to him as he arrived in Harvard Square. DEA agent Albert Reilly testified as follows:
 
 
 33
 Q. After you entered the Harvard Square area, you saw Tannous's car parked with the lights flashing. What was the next thing you saw? ...
 
 
 34
 A. ... So as El-Debeib came abreast to Tannous's car, I observed Tannous's left hand was on the wheel, he leaned over, got close to Abou-Saada and appeared to say something, and he pointed to the cab; and I then observed El-Debeib look at Tannous's vehicle.
 
 
 35
 We agree with El-Debeib that Tannous' pointing amounts to hearsay, for it is conduct intended as an assertion. See Fed.R.Evid. 801 advisory committee note (a); United States v. Ross, 321 F.2d 61, 69 (2d Cir.), cert. denied, 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123 (1963). We also agree that the pointing would ordinarily not be admissible against El-Debeib as a conspirator, for he had previously withdrawn from the conspiracy. United States v. Mardian, 546 F.2d at 978 n. 5 (citing cases). Nonetheless, the government claims that the pointing is admissible in this instance because El-Debeib's counsel did not properly object to its admission into evidence; and the objection was therefore waived. Reagan v. Brock, 628 F.2d 721, 723 (1st Cir.1980).
 
 
 36
 El-Debeib replies that he did object properly. He says that the trial judge told counsel to save all objections to co-conspirator hearsay until he made the findings required by United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir.1977)--findings that the government had produced enough evidence of a conspiracy to warrant submitting the issue and evidence to a jury. He says that he then objected.
 
 
 37
 We have examined this late objection, however, and we find it inadequate. The recorded exchange at the time of the Petrozziello findings consists of the following:
 
 
 38
 The Court: This is the time for me to make the Petrozziello findings.... I find on the basis of what I remember of the non-hearsay evidence the government has proved by a preponderance of the evidence that there was a conspiracy formed and in existence at about the time charged in the indictment, that the conspiracy was of the type charged and that each of these defendants was a member thereof....
 
 
 39
 Mr. DiMento [counsel to Fayad]: Note my objection.
 
 
 40
 Mr. Nessralla [counsel to Abou-Saada]: Mine.
 
 
 41
 Mr. Prince [counsel to Rawwad]: Mine.
 
 
 42
 Mr. Boyajian [counsel to El-Debeib]: Mine.
 
 
 43
 Mr. Abraham [counsel to Tannous]: Mine....
 
 
 44
 This exchange indicates a general objection to the adequacy of the Petrozziello finding. It does not suggest that El-Debeib had a separate objection to one part of the coconspirator hearsay that no other defendant could have raised. It neither identifies the particular testimony to which El-Debeib (now) objects, nor does it indicate the special ground for objection. It is, therefore, inadequate. See 1 J. Weinstein & M. Berger, Weinstein's Evidence, p 103 at 103-22 ("If a general objection is overruled when a specific objection should have been made, the party objecting to the evidence is precluded from asserting the proper objection on appeal."); Fed.R.Crim.P. 51; Harney v. United States, 306 F.2d 523, 534 (1st Cir.), cert. denied, 371 U.S. 911, 83 S.Ct. 254, 9 L.Ed.2d 171 (1962).
 
 
 45
 El-Debeib also says that he later made another objection. Counsel said:
 
 
 46
 I would ask that that evidence insofar as El-Debeib is concerned be stricken for consideration in evidence because it has clearly been shown by the government witnesses they put it there, that he was a cooperating individual, and to now have those boxes go to the jury for consideration as adverse evidence against him I think is highly prejudicial....
 
 
 47
 This objection mentions the relevant ground, namely, withdrawal from the conspiracy,--but it does not mention the evidence to which El-Debeib now objects, namely, the pointing. Rather, the "evidence" to which it refers consisted of packages containing heroin. Thus, it does not help El-Debeib.
 
 
 48
 In sum, El-Debeib's "hearsay" objections fail on appeal, either because the evidence to which he points is not hearsay or because he did not properly object at trial.
 
 III
 Tannous
 
 49
 * Antonious Tannous claims that the evidence the government produced against him was insufficient as a matter of law. He says that no reasonable juror could have found it showed guilt beyond a reasonable doubt. United States v. Quejada-Zurique, 708 F.2d at 859; United States v. Smith, 680 F.2d 255, 259 (1st Cir.1982), cert. denied, 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983). We do not agree.
 
 
 50
 The government introduced evidence showing that Tannous worked at an Exxon station in Chestnut Hill where he had spoken to El-Debeib near the time of the heroin delivery. A DEA agent's testimony (quoted at p. 8, supra) places Tannous next to Abou-Saada, pointing out El-Debeib, at the very time El-Debeib was in Harvard Square with the "heroin" packages, speaking to the second taxi driver. The jury had considerable evidence that Abou-Saada was a ringleader, that El-Debeib was a courier, that El-Debeib was to deliver the heroin to the other taxi driver whom he met in Harvard Square, and that Abou-Saada was worried about DEA surveillance. It might reasonably have inferred that Abou-Saada had Tannous drive him to the Square so that he could assure himself that the delivery was taking place as planned and that Tannous helped Abou-Saada by pointing out El-Debeib. A juror might thus have seen Tannous as a kind of lookout or as a kind of "getaway" driver for Abou-Saada.
 
 
 51
 The one difficult question is whether the jury could have concluded that Tannous had the requisite state of mind at the time. Did Tannous know about Abou-Saada's criminal activities, or had Abou-Saada told Tannous a false but 'innocent' story about what was happening? The evidence favoring the former interpretation included 1) Tannous' past association with the other conspirators; 2) the nature of Tannous' activities in Harvard Square; 3) the other conspirators' reluctance to deal with those they did not trust; and 4) testimony by DEA agent James Connolly that Tannous, when stopped, said he had been "looking for someone" and he "didn't meet them"--a statement inconsistent with Tannous' previously observed actions. A juror faced with this evidence may have viewed Tannous' statement to the DEA agent as an effort at evasion, and may also have thought the likelihood that Abou-Saada had used an "unknowing" person very small. We cannot say such a juror would be unreasonable in concluding guilt proved beyond a reasonable doubt--particularly in the absence of any evidence (in the government's case) that Abou-Saada, in fact, gave Tannous a false explanation of what was happening. Compare United States v. Guerrero-Guerrero, 776 F.2d 1071, 1074 (1st Cir.1985) with United States v. Glasgow, 658 F.2d 1036, 1040-42 (5th Cir. Unit B 1981) (no false exculpatory statement; no prior association with other conspirators).
 
 
 52
 Of course, if one looks beyond the government's case, to the defense, one finds additional evidence supporting Tannous. Tannous testified that Abou-Saada gave him an innocent explanation of why he wished a ride to Harvard Square. Yet, the jury may well have thought Tannous evasive on the witness stand and taken a negative view of his credibility. In addition, the government presented in rebuttal, testimony that Tannous said during police questioning that Abou-Saada had given him $2500 which he, in turn, gave to El-Debeib (a fact that Tannous had denied on the witness stand). Given the additional evidence, along with the jury's right to assess credibility, to include defense and rebuttal evidence in deciding the "sufficiency" of the evidence hurts Tannous more than it helps him.
 
 
 53
 In sum, we find sufficient evidence to support Tannous' conviction whether we restrict our review to the evidence presented in the government's case in chief, see Cephus v. United States, 324 F.2d 893, 897 (D.C.Cir.1963), or whether, as is more often appropriate in this circuit, we look to all the evidence. United States v. Notarantonio, 758 F.2d 777, 788 (1st Cir.1985) (court must consider all the evidence in weighing 'sufficiency' if it reserves judgment on motion for acquittal made at close of government's case until the close of all the evidence); see also Colella v. United States, 360 F.2d 792, 802 (1st Cir.), cert. denied, 385 U.S. 829, 87 S.Ct. 65, 17 L.Ed.2d 65 (1966); cf. United States v. Fusaro, 708 F.2d 17, 23-24 (1st Cir.), cert. denied, 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983) (limited exception to this rule where codefendant's case impels defendant's presentation of evidence).
 
 B
 
 54
 Tannous next argues that the district court should have suppressed statements he made to government agents because he did not knowingly waive his Miranda rights. Essentially, he claims that his English was too poor, and his education, background, and intelligence too limited for him to understand the Miranda warnings the agents read him before asking him questions. The district court, after an extensive hearing, found the contrary, and that finding has adequate record support.
 
 
 55
 Tannous argues that the very fact the government provided him with an interpreter indicates a lack of knowledge of English. He adds that the transcript of his testimony reveals poor English. He is undeniably a foreigner. And, he testified to a limited educational background having permanently left school at age 16. On the other hand, Tannous has lived in the United States for 16 years. The DEA agents who initially questioned him said he could answer their questions perfectly well in English, to the point of describing the medical details of a complicated neck injury he had suffered. And, his interpreter said he would sometimes answer questions in English before they were translated. Additionally, the suppression hearing transcript offers considerable support for the district court's conclusion that Tannous was evasive and inconsistent. His claims, for example, that he understood nothing at all, not even the Arabic translations of the Miranda warnings (because of the interpreter's "Egyptian accent") might reasonably be taken as showing the opposite. After reading the hearing record, we cannot say that the district court's findings (that Tannous understood English, and that he understood the Miranda warnings) was "clearly erroneous." United States v. Jobin, 535 F.2d 154, 156 (1st Cir.1976) (clearly erroneous standard appropriate in reviewing district court's findings of fact at suppression hearing); United States v. Cox, 752 F.2d 741, 747 (1st Cir.1985) (same). And, given this factual support, the district court's conclusion that Tannous had knowingly waived his rights has adequate support. United States v. Payton, 615 F.2d 922, 923 (1st Cir.), cert. denied, 446 U.S. 969, 100 S.Ct. 2950, 64 L.Ed.2d 830 (1980).
 
 C
 
 56
 Tannous argues that his sentence of six years imprisonment was too long given his minor role in the conspiracy, his age, his background, his previous behavior, his medical history, the sentences given to the more important conspirators, and so forth. The sentence, however, is well within the statutory twenty-year maximum, 21 U.S.C. Secs. 846, 841(b)(1)(A)(i), and the appropriate weight to be given to the factors Tannous mentions is, as a matter of law, up to the district court. United States v. Kimball, 741 F.2d 471, 475 (1st Cir.1984) (citing United States v. Tucker, 404 U.S. 443, 447, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972) for the proposition that a sentence within statutory limits is not generally subject to review); United States v. Tracey, 675 F.2d 433, 441 (1st Cir.1982).
 
 IV
 Fayad and Abou-Saada
 
 57
 Fayad and Abou-Saada argue that the district court should have suppressed the evidence the government obtained by wiretapping Fayad's garage. They say the warrant authorizing the wiretaps was legally defective in that the affidavit supporting the government's request for the warrant failed to satisfy the statutory requirement that it show that "normal investigative procedures have been tried and have failed, or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. Sec. 2518(3)(c).
 
 
 58
 As the Supreme Court has written, "[t]his language, however, is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime," United States v. Kahn, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974), and that the section safeguards against wiretapping "procedures [being] ... routinely employed as the initial step in criminal investigation." United States v. Giordano, 416 U.S. 505, 515, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).
 
 
 59
 We have held that courts are to read an affidavit showing compliance with this requirement in a "practical and commonsense manner." United States v. Scibelli, 549 F.2d 222, 226 (1st Cir.), cert. denied, 431 U.S. 960, 97 S.Ct. 2687, 53 L.Ed.2d 278 (1977); and, that the government does not need to exhaust all other investigative procedures before resorting to wiretapping. United States v. Southard, 700 F.2d 1, 28 (1st Cir.), cert. denied, 464 U.S. 823, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983) (citing cases). Nor must ordinary techniques be shown to have been wholly unsuccessful. United States v. Scully, 546 F.2d 255, 260-61 (9th Cir.1976), vacated on other grounds sub nom. United States v. Cabral, 430 U.S. 902, 97 S.Ct. 1168, 51 L.Ed.2d 578 (1977). Rather, the district court must satisfy itself that the government has used normal techniques but it has encountered difficulties in penetrating a criminal enterprise or in gathering evidence--to the point where (given the statutory preference for less intrusive techniques) wiretapping becomes reasonable. United States v. Scafidi, 564 F.2d 633, 641 (2d Cir.), cert. denied, 436 U.S. 903, 98 S.Ct. 2231, 56 L.Ed.2d 401 (1977); United States v. Pacheco, 489 F.2d 554, 565 (5th Cir.), cert. denied, 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1974).
 
 
 60
 In this case, the government attached to its warrant request a highly detailed, thirty-five page factual account of the government investigation to date--in the form of an affidavit of DEA agent James Connolly. The affidavit contains facts designed to show, among other things, that:
 
 
 61
 1. DEA agents could not identify certain unknown key co-conspirators or obtain necessary evidence simply by watching those previously identified;
 
 
 62
 2. The DEA could not obtain search warrants and seize the contraband because it did not know where the conspirators had stored it;
 
 
 63
 3. The DEA knew of no informants who would help apprehend the conspirators;
 
 
 64
 4. The DEA had twice tried to introduce undercover agents to the conspirators so that they could pretend to buy drugs and then arrest the sellers; but these efforts failed to uncover key conspirators because of the conspirators' reluctance to deal with non-Lebanese;
 
 
 65
 5. The DEA did not wish to use "grants of immunity" because all the presently identified members of the conspiracy seemed to play important roles; in any event it seemed unlikely any of them would testify against the others;
 
 
 66
 6. The RCMP's wiretaps had not identified all key members of the conspiracy or yet produced sufficient evidence to convict them all;
 
 
 67
 7. The DEA could not identify important unidentified members of the conspiracy or gather sufficient evidence through examination of telephone toll records.
 
 
 68
 The appellants accept most of the facts recited in the affidavit as sufficiently supporting these seven assertions which, in turn, are more than sufficient to satisfy the requirement of Sec. 2518(3)(c). Compare United States v. Southard, 700 F.2d at 28; United States v. Scibelli, 549 F.2d at 227. Appellants aim their attack at point 4--the DEA's efforts to introduce undercover agents. They say that the affidavit's statement that "unsuccessful" attempts to introduce "an undercover agent to Fayad" is overstated, that it is not borne out by the facts the affidavit recites; and in any event, those facts are shown untrue by a wiretap recording introduced at trial. And, they conclude that these defects require a finding that the government has not met its burden under Sec. 2518(1)(c).
 
 
 69
 In our view, even as to point 4 the affidavit was adequate. It indicates a 'reasonable likelihood' that efforts to use undercover agents would fail to find and to catch all the key conspirators. 18 U.S.C. Sec. 2518(3)(c). For one thing, the affidavit recounts lengthy government investigations that did not wholly succeed. It adds that Fayad, in statements recorded by the RCMP, "insisted he was unwilling to meet anyone he didn't know." It says that Bassett told RCMP Corporal Froud that "Fayad will not deal with anyone whom he doesn't know, and that he specifically refuses to deal with anyone who is American or Canadian (and not Lebanese)." It also reproduces a taped conversation from an investigation of Yacoub Fayad one year earlier (in 1983), in which an undercover agent (John Costanzo) who had just arranged to buy some heroin, seems to be making an effort to meet Fayad, but Fayad is reluctant to meet him. Finally, it recounts Froud's trip with Bassett to Boston in 1984 (see p. 4, supra ). It says that "Bassett suggested that Fayad meet the undercover officer, but Fayad said that "he ... would not [do so] under any circumstances." It adds that Fayad told Bassett "to come alone ... and that he was frightened she might be followed."
 
 
 70
 Appellants' argument basically concerns the details of these two last mentioned incidents, namely Costanzo's undercover efforts in 1983 and Froud's trip with Bassett. They say that Costanzo's 1983 efforts to meet Fayad failed, not because of Fayad but because of the government. They note that Costanzo at the time had said to Fayad "We're gonna have to sit down after, me and you, huh" and Fayad said, "Okay." This single sentence in a transcript of a taped conversation, about a hypothetical future meeting, is not sufficient, however, to overcome other evidence of Fayad's reluctance to meet with outsiders--even in 1983, for Fayad took considerable precautions not to be present when Costanzo bought the drugs. If appellants mean to fault the government for failing to follow up on this 1983 "invitation," after Costanzo's "purchase," we can find no fault, for the government could not easily follow up after it arrested the conspirators who appeared at the sale.
 
 
 71
 Appellants also argue that the affidavit's account of the Froud trip is in error. Bassett, they say, did not suggest that she bring Froud to meet Fayad in Boston; rather, Bassett wanted to bring her husband. It is difficult to see why this makes a difference, for, if Fayad was reluctant to meet Bassett's husband, he was likely to be reluctant to meet Froud. Regardless, we must take the facts as stated in the affidavit, for the validity of a warrant depends upon the sufficiency of the affidavit on its face, where, as here, there is no allegation that the affiant deliberately lied. Franks v. Delaware, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978); Krohn v. United States, 742 F.2d 24, 26-27 (1st Cir.1984).
 
 
 72
 In essence, appellants have aimed their arguments at peripheral matters. The basic point is that the affidavit sets out a history of 1) a detailed investigation, 2) efforts to use other less intrusive investigatory techniques, 3) failure to obtain the identities of or evidence against all the conspirators and 4) various statements suggesting reluctance to meet with unknown persons. The district court could reasonably conclude that normal investigative procedures "reasonably appear to be unlikely to succeed."
 
 
 73
 Appellants make a final point. They argue that the government had enough evidence to convict the conspirators, so it did not need the wiretaps. Whether or not this was true in respect to Fayad, however, it is untrue in respect to Abou-Saada, the key source of supply. Thus, it was reasonable to seek wiretaps to obtain evidence against all the key conspirators, only some of whom were known at the time of the application for the warrant. See United States v. Messersmith, 692 F.2d 1315, 1317-18 (11th Cir.1982).
 
 
 74
 The judgments of the district court as to defendants Assada Abou-Saada, Antonious Tannous, and Yacoub Fayad are affirmed. While we retain appellate jurisdiction, the cause of Milad K. El-Debeib is remanded to the district court for further proceedings in accordance with this opinion. The district court is to advise this court when a decision has been rendered.
 
 
 
 *
 Of the District of Massachusetts, sitting by designation