UNITED STATES of America, Appellee,

v.

James MARTORANO,
Defendant-Appellant.

UNITED STATES of America, Appellee,

v.

Charles DeMETRI & James DeMetri,
Defendants-Appellants.

UNITED STATES of America, Appellee,

v.

Howard T. WINTER,
Defendant-Appellant.

UNITED STATES of America, Appellee,

v.

Elliot Paul PRICE, Defendant-Appellant.

UNITED STATES of America, Appellee,

v.

Melvin GOLDENBERG,
Defendant-Appellant.

Nos. 80–1831 to 80–1834 and 80–1846.

United States Court of Appeals,
First Circuit.

Argued March 5, 1981.

Decided Oct. 30, 1981.

Albert F. Cullen, Jr. and Richard Egbert, Boston, Mass., with whom Cullen & Wall, Boston, Mass., was on brief, for appellants Howard T. Winter and James Martorano.

Jeffrey M. Smith, Boston, Mass., Joseph Travaline, Burlington, Mass., and Morris M. Goldings, Boston, Mass., Jeanne Baker, Cambridge, Mass., with whom Paul T. Smith, Harvey R. Peters, Barry Haight, Milton, Mass., Hawkes & Goldings, Boston, Mass., Baker & Fine, Cambridge, Mass., were on brief, for appellants Charles Demetri & James Demetri, Elliot Paul Price, and Melvin Goldenberg.

Robert M. Waller, Sp. Atty., Dept. of Justice, Washington, D. C., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., and Jeremiah T. O'Sullivan, Sp. Atty. Dept. of Justice, Boston, Mass., were on brief, for appellee.

Before CAMPBELL, BOWNES and BREYER, Circuit Judges.

BOWNES, Circuit Judge.

After conviction and sentencing, appellants brought motions for a new trial and an evidentiary hearing thereon based on the alleged suppression of exculpatory material and the discovery of new evidence. These motions have an entirely different basis than did those whose denial we affirmed in cases Nos. 79–1437, 1438, 1441, 1442, 1446 and 1476. The motions now before us,

brought pursuant to Federal Rule of Criminal Procedure 33, were filed between August and October of 1980. Oral argument was heard by the district court on November 17 and on December 12, 1980, it issued a written memorandum and order denying appellants an evidentiary hearing and their motions for a new trial.

The evidence which appellants claim entitled them to a new trial can best be considered by separating it into four segments. The "Detroit Information" consists of several FBI reports of interviews with Anthony Ciulla conducted in 1976, 1977 and 1978 relative to race fixing in the Detroit, Michigan, area and Ciulla's grand jury testimony in Detroit on October 7, 1977, on the same subject. The "McCarron" material is based on affidavits by Margaret McCarron which appellants claim shows that Ciulla lied at the trial. The "Owen" evidence purports to prove that Robert Owen, who pled guilty during the trial, told his attorney that Ciulla had told him (Owen) that he (Ciulla) had lied about the role defendants Price and Goldenberg had played in the race fixing schemes. Appellants also make a *"Mesarosh"* claim based on the fact that the strike force attorney assigned to the Eastern District of New York did not use Ciulla as a witness in a race fixing case held in that jurisdiction.

## I. THE DETROIT INFORMATION.

The first question is whether this material falls within the compass of *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and, if so, which of the three *Agurs'* categories applies. We find that all of the Detroit information, the FBI 302's and the grand jury testimony was exculpatory material within the scope of *Agurs.*[1] It involved "the discovery, after trial, of information which had been known to the prosecution but unknown to the defense." *Id.* at 103, 96 S.Ct. at 2397. It seems clear, however, that the first two

*Brady*[*] situations, as defined in *Agurs*, do not apply. We reject the appellants' insistent and repeated claims that the Detroit material shows that Ciulla perjured himself and that the Government knew or should have known it. *Id.* at 103, 96 S.Ct. at 2397. Nor do we think that there was a specific pretrial request for the material. *Id.* at 104, 96 S.Ct. at 2397–98. Contrary to appellants' assertions we find no support in the record for the claim that either the magistrate or the district court ordered the material, or any part of it, disclosed to defendants prior to trial.

The motions for exculpatory evidence, although lengthy and comprehensive, were not directed to any particular source; they were basically detailed boiler plate requests for any and all exculpatory evidence. We are, therefore, confronted with the general request situation, the third category discussed in *Agurs. See United States v. DiCarlo*, 575 F.2d 952, 958–60 (1st Cir.), *cert. denied*, 439 U.S. 834, 99 S.Ct. 115, 58 L.Ed.2d 129 (1978); *United States ex rel. Moore v. Brierton*, 560 F.2d 288, 292 (7th Cir. 1977), *cert. denied*, 434 U.S. 1088, 98 S.Ct. 1285, 55 L.Ed.2d 794 (1978). We do not think that the fact that the United States Attorney prosecuting this case asked an attorney on the Detroit Strike Force whether there was any exculpatory material in the Detroit files and received a negative reply avoids the impact of *Agurs.* The prosecutor in charge of this case had a positive duty to review the files himself or have them checked by someone thoroughly familiar with the case. Nor do we think that *Agurs* is avoided because the Detroit grand jury testimony of Ciulla was turned over to the court during the trial for an in camera inspection. The *Brady* motions were made prior to trial and the judge should have been apprised of the existence of the testimony before trial so he could have examined it, if he wished. Although

---

1. Although the district court did not specifically cite to *Agurs* in this section of its opinion, it did use the correct *Agurs* test. The Government does not seriously dispute the application

of *Agurs*; its argument is directed mainly to materiality.

* *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

it probably made no difference in this case, there may be cases in which a pretrial in camera inspection of alleged *Brady* material would expedite matters considerably.

We now evaluate the Detroit material in the context of the entire record to determine if the omitted material creates a reasonable doubt that did not otherwise exist. *United States v. Agurs*, 427 U.S. at 112, 96 S.Ct. at 2401–02; *United States v. Imbruglia*, 617 F.2d 1, 5 (1st Cir. 1980).

*The 302's*

Appellants first contend that Ciulla's statement, made prior to his formal interviews, that he would not provide information about his organized crime connection in the Boston-New England area is materially exculpatory because it undercuts the Government's theory that Winter was an organized crime figure in the Boston-New England region. According to the FBI preliminary report, Ciulla "would not talk about the Boston La Cosa Nostra (LCN) for three reasons. First, he would be killed if he talked. Secondly, even if placed in Federal protective custody, his family would be exposed to retaliation and thirdly, he was not associated close enough to provide information that would result in convicting any one person." We note that the first two reasons, which imply significant knowledge, contradicts the third, which asserts ignorance. However that may be, the fact is that there was no testimony in the case by Ciulla, or anyone else, that Winter was a member of the organized crime syndicate in New England. Indeed, at defendants' request the district court ruled at the start of the trial that it would not allow "[a]ny reference to mafia, Cosa Nostra, or organized crime by that name." Nor did Ciulla refer to Winter in the Detroit 302's. Although it is conceivable that the jury would infer that only an organized crime figure would retain a person such as Ciulla to fix horse races, we agree with the district court that it was extremely unlikely that the defendants would have tried to impeach Ciulla by showing that Winter was a member of organized crime in the Boston-New England area. And even if they did, Ciulla could have said that he changed his mind since making the statement, which he did, if Winter was in fact, as appellants suggest, an organized crime figure in New England. We find that Ciulla's preliminary statement to the FBI in Detroit falls far short of being material under the applicable *Agurs* standard.

In addition to describing in detail race fixing in the Detroit area, Ciulla also told the FBI that in 1974 his "biggest score" was made at the Pocono Downs racetrack in Wilkes-Barre, Pennsylvania. Appellants contend that the 302 information relative to Pocono Downs contradicts his court testimony about fixing races there. We find no significant contradictions. In the FBI statement Ciulla said he fixed sixty races, one to two a day, during the 1974 racing season. Ciulla's trial testimony focused on only four races: the ninth race on August 12, the sixth race on August 18, the fourth race on August 20 and the third race on September 8. This leaves at least fifty-six other races in which the appellants were not implicated. Ciulla testified that he went to Pocono Downs for two reasons: to try to get Spread The Word into a claiming race, which was not accomplished, and because Robert Owen[2] told him that he could fix as many races a day as he wanted. When Ciulla called Winter to tell him that the ninth race was fixed, he testified that he also told Winter that he realized that because it was Pocono Downs, the outside betting activity would be limited. It is not inconceivable that Ciulla and Owen decided to keep the winnings for themselves on all but four of the sixty races that were fixed.

Ciulla's 302 statement arguably contradicts his courtroom testimony in only one respect. He told the FBI that three members of the Pittsburgh and Philadelphia mob, Occhipinti, Sciandra and Conancio, financed the Pocono Downs fixing. At the trial Ciulla described this trio as "runners." Although this might have been explored on cross-examination, we note that, according

---

2. Owen pled guilty during the trial.

to Ciulla, the DeMetris acted as runners in the race at Garden State on February 8, 1975, in which Spread The Word was entered. It is not implausible that the financiers also acted as runners.

It is important to point out that the Pocono Downs evidence only implicated Winter and Martorano. The DeMetris were not involved at all and the motions of Price and Goldenberg for judgments of acquittal as to Counts Thirty-Seven and Thirty-Nine, interstate travel involving Pocono Downs, were granted. Nothing in the FBI statement contradicts Ciulla's testimony that he called Winter and Martorano after each of the four races was fixed and told them what horse to bet. Nothing in the 302 contradicts Ciulla's testimony that Winter told him to beat up a trainer, Ewalt, for using his bribe money to bet on the fixed race and to beat up a jockey, Gallop, for not holding his horse which finished second in the third race on September 8. We do not think that the statements given to the FBI about Pocono Downs reached the *Agurs'* level of materiality.

Price and Goldenberg argue strenuously that the 302's and the grand jury testimony show that Ciulla had Las Vegas contacts through the people who were financing the Detroit fixing and, therefore, Price and Goldenberg were not needed for outside betting as he testified at trial. But neither the 302's nor the grand jury testimony show that Ciulla himself knew individuals in Las Vegas who would play the role that he testified Price and Goldenberg did in placing bets on fixed races with bookies throughout the country. Before the Detroit grand jury, Ciulla testified that his financiers were Niki Russo, Anthony Tassone and his son, Jimmy Tassone. He told the grand jury that they were the ones who would take care of the extensive outside betting in Las Vegas. This does not show that Ciulla himself had the Las Vegas contacts. We agree with the district court that the impeachment weight of this evidence was slight. We do not doubt that, in the words of appellants, "in the hands of skilled counsel at trial, [this would have] opened up a rich vein of detail." But the vein would

not have led to the mother lode; it would have petered out to nothing.

Finally and definitely least, we discuss the claim that Ciulla's statements in the 302's and to the grand jury about how he "suckered greedy businessmen" out of "front" money contradicts his cross-examination testimony that he had not been a tout "at any time in this experience." We note first that the testimony is contradictory. Ciulla first denied flatly that he had been a tout, but the last question and answer in this line could be construed as an admission to being one:

> Q. Well, you say fixed races. I'm asking you if you were ever a tout?
>
> A. *Apparently,* I fixed races. I've been convicted. (Emphasis added).

In his FBI statement and grand jury testimony, Ciulla explained that he would approach three or four businessmen, tell them he was fixing a race and if they would put a certain amount of money up front, he would give them the winning combinations on the race. The combinations furnished, however, were not the winning ones; Ciulla "suckered" the businessmen out of their "front" money. We think it significant that Ciulla himself never used the word "tout"; that is the FBI description given to this operation. None of the dictionary definitions of "tout" encompasses the deliberate giving of false information about races. We don't know and do not decide whether Ciulla was a "tout." It is abundantly clear that he was a crook, but the jury knew that. We do not think that this additional confirmation of Ciulla's dishonesty would have made any difference in the jury's credibility assessment of his testimony.

We agree with the district court that an evidentiary hearing was not necessary. We shudder to think of how much time these imaginative and ingenious attorneys would have spent mining the "rich vein of detail" dug out from the 302's to no avail.

## II. THE McCARRON AFFIDAVITS.

Margaret McCarron gave three affidavits relative to her dealings with Ciulla. Two of

them are dated April 24, 1980. The third is dated July 28, 1980, the same date on which all three were turned over to Paul Smith and Barry Haight, attorneys for Price and James DeMetri. They can be summarized as follows.

*The First Affidavit.*

Sometime within the week prior to December 26, 1978, McCarron tried to contact Ciulla, first through Strike Force Attorney O'Sullivan and then through FBI Agent Thomas Daley. McCarron wanted to interview Ciulla because she planned to write a book about him in collaboration with a Dale Austin. Ciulla called McCarron on December 26 and discussed the book; Ciulla told her that he was interested in getting money for himself. From then on Ciulla called McCarron frequently. At times, he appeared to be drunk and calling from bars or nightclubs.

McCarron met with Ciulla and his wife, Helen, in Portland, Oregon.[3] They discussed the writing of a book. Ciulla told McCarron that he wanted to reserve the movie and television rights but he would go along with her if she gave him $25,000. She gave him $2,000 in cash and got a receipt for it. McCarron had understood from previous telephone conversations with Ciulla that she was to have the movie and television rights. Ciulla, however, struck from a proposed contract her rights to movie and television earnings. She then called Agent Daley who said he was washing his hands of the matter.

Ciulla called McCarron many times after that. At least once he told her he was looking out for himself and intended to make a million dollars out of the movie and television rights. He told her that she was "out" from the first day. He also told her that there were some people against whom he had a personal vendetta and that he was going to accuse them of various crimes. We quote the rest of the affidavit.

He told me that he had lied during the trial of the case in Boston involving Elliot

Price and other defendants and that he had brought the Las Vegas people into this case because he had been down to Las Vegas and had become drunk and disorderly and that he had lost a lot of money gambling and when he went to get additional credit, he was turned down and that this was the reason why he felt that he would rather bring those people into the case than others to whom he felt a personal loyalty. "My credibility is the most important thing to me because when I get out of this F _ _ _ _ _ program I am going to get my money for my story. It is my story and I'll lie whenever I feel like it," is what he said to me.

*The Second Affidavit.*

Ciulla told McCarron over the phone on various occasions that he had to say what the Government people told him to say. He also told her that he and Agent Daley were close personal friends. The affidavit ends with this sentence: "Ciulla told us that Daley and the Justice Department told him what to say in the trial of the case."

*The Third Affidavit.*

This affidavit is mainly a recital of McCarron's unsuccessful attempts to enter into a contract with Ciulla for writing and publishing a book. She describes her contacts with Dale Austin whom she expected to help her write the book. Austin lost interest early and withdrew from the venture. McCarron then talked to an agent in New York, Sterling Lord, who told her she needed more material. Gerald R. Strine, Editor of the Horseman's Journal, told her that if she would introduce him to Ciulla so that he could get enough information for an outline, there would be an instant advance. She immediately called Ciulla and told him to contact Strine, which he did. Strine interviewed Ciulla for ninety minutes and wrote a three-chapter outline which was submitted to a literary agent, Milton Fenster. Fenster, in turn, submitted the outline to Bantam Books and Columbia Pic-

---

**3.** No date is given in the affidavit, but it seems agreed that this happened after Ciulla testified, but before the trial ended.

tures with an asking price of $500,000. After some negotiations, both Bantam and Columbia turned the deal down. Ciulla told McCarron in early June that he had told Strine to stop trying to sell the property; he was going to sit on it until the New York indictments were handed down. McCarron flew to New York in July to talk to Fenster personally. She told Fenster that "I had been spending my money right and left" and wanted to hear from him why the deal with Columbia Pictures had fallen through. Strine and Fenster then got into a "battle" over the rights to the book (which was still nonexistent). Fenster approached five different movie companies and Mike Wallace of Sixty Minutes, but to no avail. According to McCarron, "[a]ll of the business dealings that I have just put on paper took place during the trial in Boston."

*The Counter-Affidavits.*

Thomas Daley executed an affidavit on October 10, 1980. He stated that McCarron contacted him in late December, 1978, and requested an interview with both him and Ciulla. He informed her that he could not be interviewed without permission from FBI headquarters and not until the case was fully over in the courts. He said that he would pass on her request to interview Ciulla to the witness protection program. Daley denied any knowledge of McCarron's intention to write a book about Ciulla; she had told him that she was thinking of writing a book about horse racing. Daley stated that he never told Ciulla what to say in his testimony "other than to tell the truth about the other defendants." Daley's affidavit further states that his relationship with Ciulla was only that of the normal agent-witness one, that Ciulla never discussed any book or movie and television rights with him and that he was not aware of any negotiations between Ciulla and McCarron.

Ciulla's affidavit was executed on November 5, 1980. He admitted talking to McCarron several times about her ideas for a book, but stated that he never gave her permission to represent him. On the occasions that he called McCarron, he was not

intoxicated. Ciulla admitted receiving $2,000 from McCarron in Portland, Oregon, but stated that he had met with her because she said she would give him $25,000 for a six months option for the right to write and publish a book on his race fixing activities. He gave her six months to raise the additional $23,000 and find a publisher. Ciulla denied that he ever told her he needed convictions to bolster his credibility for a book. He denied telling her that his trial testimony was not true or that he falsely accused anyone of a crime because of a personal vendetta. Ciulla stated that he never told McCarron that the Government was telling him what to testify to during the trial and that "at no time during the trial in Massachusetts did I lie or testify falsely."

McCarron filed a further affidavit dated November 13, 1980, in which she said that during her first conversation with Daley, she told him specifically that she intended to do a book about Ciulla. She further stated that prior to the end of the trial, she told Daley that she gave Ciulla $2,000 in Oregon and wanted it back and Daley told her to contact Ciulla through the United States Marshal's office in Boston.

*Ciulla's "Book" Testimony.*

During cross-examination, Ciulla admitted that he had been approached about writing a book, but stated that he hadn't dealt with anyone relative to ghost writing or collaborating with him. He agreed that he hoped to write a book. Earlier he had stated that he hoped he would earn some money after he finished testifying. Ciulla denied that he was waiting to negotiate about a book until convictions were returned in the case. He testified that he spoke to a writer from Roper magazine over the phone about a book, but no figures were mentioned.

■ We agree with the district court that *Agurs* does not apply to the McCarron affidavits. Accepting McCarron's affidavits at face value, this was new evidence of which the Government had no knowledge prior to the time Ciulla testified and certainly not prior to trial. *See United States*

v. *Agurs*, 427 U.S. at 111, 96 S.Ct. at 2401. The standard of review is abuse of discretion. *United States v. Wright*, 625 F.2d 1017 (1st Cir. 1980).

A motion for new trial on the basis of newly discovered evidence will ordinarily not be granted unless the moving party can demonstrate that: (1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of the evidence was not due to lack of diligence by the defendant; (3) the evidence is material, and not merely cumulative or impeaching; and (4) it will probably result in an acquittal upon retrial of the defendant.

*Id.* at 1019.

We do not think the district court abused its discretion in finding that the evidence was merely impeaching and that it would not have affected the verdict. Nor do we think that an evidentiary hearing was either necessary or desirable. Such a hearing would essentially have been a swearing contest with McCarron pitted against Ciulla and Daley. There probably would be side excursions involving the others who, along with McCarron, saw in Ciulla a golden opportunity to pander to the public's thirst for an inside view of crime. There is no "smoking gun" evidence or anything approaching it, only the statements of a disappointed opportunist who was bilked out of $2,000 by one whom she knew was a self-confessed briber, cheat and crook. As we already have noted, the jury was well aware of Ciulla's character and way of life. This was not the straw that would have broken the camel's back; it was just more chaff to scatter in the wind.

### III. THE OWEN CLAIM.

Robert Owen was a defendant at the start of the trial. He pled guilty before the trial was over. Ciulla's testimony portrayed him as a willing and eager accomplice who knew to whom bribe money could be successfully paid. On August 25, 1980, Attorney Paul T. Smith, counsel for defendant Price, executed an affidavit based on three telephone conversations with Owen and a personal meeting with him at the Federal Penitentiary in Allentown, Pennsylvania, on July 22, 1980. In essence, the affidavit states that Owen told Attorney Smith that Ciulla had lied about defendants Price and Goldenberg; that they were innocent. According to the affidavit, Owen told FBI Agent Flaherty, his own attorney, Brian J. McMenimen and Neil Jon Firetog, United States Strike Force Attorney assigned to the Eastern District of New York, that Ciulla had lied about Price's involvement in the race fixing scheme.

Owen executed an affidavit on September 25, 1980, that denied point-by-point the statements attributed to him by Attorney Smith. Agent Flaherty executed an affidavit on November 6, 1980, in which he denied that Owen had told him that Ciulla had lied about Price. In an affidavit dated October 30, 1980, Attorney Firetog completely refuted the statements in the Smith affidavit that Owen had told him that Ciulla had lied about Price and Goldenberg. Firetog also stated that at no time did Owen say that Price and Goldenberg were innocent. Firetog's statement also contradicted Owen's purported statements to Attorney Smith relative to a jockey by the name of Jose Amy. Statements in the Smith affidavit involving alleged conversations between Owen and FBI Agent Martin Conley were denied in an affidavit executed by Conley in October of 1980.

As did the district court, we find it somewhat strange that Owen waited for a year after the trial to try and rescue Price and Goldenberg from Ciulla's alleged perjury. He had two opportunities for baring his breast, when he pleaded guilty and at sentencing. In the light of Owen's affidavit, which is a direct counterpoint to the statements contained in Attorney Smith's affidavit, we see no point in an evidentiary hearing. Under the abuse of discretion test as set forth in *United States v. Wright*, 625 F.2d 1017, already fully discussed, there is no basis for setting aside the district court's denial of appellants' motions for a new trial.

## IV.  THE MESAROSH CLAIM.

■ This is yet another variation on appellants' main theme; Ciulla was lying and the Government knew it.  Appellants' attempt to bring this case within the holding of *Mesarosh v. United States*, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956), falls far short of the mark.  In *Mesarosh* the Solicitor General of the United States moved to remand the case to the trial court because of untruthful testimony given before other tribunals by a Government witness.  *Id.* at 3, 77 S.Ct. at 2.  We do not think that the failure of the United States Attorney in the Eastern District of New York to use Ciulla in a race fixing trial amounts to an admission that the Government knew that Ciulla lied in this case.  We would so find even if the New York prosecutor had not filed an affidavit stating, *inter alia*, "I considered using Ciulla as a rebuttal witness, but his testimony proved unnecessary."

Considering his background and way of life, it can always be argued that Ciulla's testimony, or parts of it, was suspect.  Under our system of justice, however, the jury determines the credibility of the witness.  As we have already noted, Ciulla was subjected to lengthy, intense and skilled cross-examination.  Based on the record, we cannot fault the jury's acceptance of Ciulla's testimony.  None of the new evidence, either singly or in combination, is sufficiently material to warrant a new trial.

*The order of the district court denying appellants' motion for a new trial and an evidentiary hearing thereon is affirmed.*