Peter A. LEBON, Petitioner

v.

UNITED STATES of America,
Respondent.

Civ. A. No. 94–11486–DPW.

United States District Court,
D. Massachusetts.

March 30, 1995.

Peter A. Lebon, Lewisburg, PA, petitioner pro se.

Christopher F. Bator, Asst. U.S. Attorney, Donald K. Stern, United States Attorney, D. Massachusetts, Boston, MA, for Respondent.

## OPINION AND ORDER

FUSTE, District Judge, Sitting by Designation.

Petitioner, Peter LeBon, has submitted a writ of habeas corpus, pursuant to 28 U.S.C. § 2255 (1988), requesting this court to vacate his conviction for possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (1988). Petitioner claims that he did not receive effective assistance of counsel at trial and that the court improperly allowed the prosecution to go into the nature of petitioner's prior felony conviction. He also claims that prosecutorial misconduct contaminated the verdict and the court denied petitioner his sixth-amendment right to confront adverse witnesses. Having reviewed the trial transcript, we conclude that LeBon's conviction should stand.

## I.

### Facts

Petitioner was tried and convicted before this court in May 1992 for the unlawful possession of a firearm. Pursuant to 18 U.S.C. § 924(e)(1) (1988), this court sentenced LeBon to 240 months of incarceration with five years of supervised release. This conviction was based on events that transpired during the afternoon of August 12, 1990, in Mashpee, Massachusetts.[1]

In the mid-afternoon of August 12, 1990, petitioner, a Mashpee resident who was known in the community by his nickname, "Musky", traveled locally to Attaquin Park with his friend, Tina Pina. While atop a beachside hill located within the park, petitioner initiated a verbal confrontation with Thomas Maddox, a man with whom petitioner had had an argument the previous evening. As tempers flared, petitioner, still in his car, yelled either, "Clear the kids off the hill! I'm coming back with something for

---

1. The facts, as they are here related, follow the presentation of facts found on page two of the Government's Opposition to Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255. *See Docket Document No. 11* at 2.

you!" or, "Clear the kids off the hill! I'm coming back with a gun!" The petitioner then sped off.

Shortly thereafter, Howard Nield, the Mashpee Director of Beaches, arrived at Attaquin Park on routine patrol. Upon his arrival, he was surrounded by approximately seven or eight park goers who informed him of the petitioner's confrontation with Mr. Maddox and of the threat to return made by the petitioner. Mr. Nield then radioed the Mashpee police dispatcher that "Musky" and Tommie Maddox had had an argument on the hill and that Musky had just left in his blue Dodge Daytona for some nearby condominiums with a declared intent to return with a gun. (Tr. 1:66–68). Shortly thereafter, Detective Scott McCabe arrived at the park, learned from Mr. Nield of the incident on the hill, and, with the aid of Patrolman Randy DeMello, initiated a search for petitioner in the area around Tina Pina's condominium. (Tr. 1:69, 166–68).

Petitioner and Tina Pina had already left the area of Attaquin Park for the neighboring town of Falmouth. (Tr. 1:94). After stopping at the store for a few minutes to purchase a fan and some popsicles, petitioner and Tina Pina proceeded in the direction of Mashpee to the home of Ramona Cardoza, a woman with whom the petitioner was then living. (Tr. 1:97–98). While Tina Pina remained in the car, petitioner entered the house and, a few minutes later, returned to the car. As petitioner and Tina Pina then continued toward Mashpee, petitioner spotted Stefan Pina, a friend of the petitioner, near a pay phone.[2] At petitioner's suggestion, Mr. Pina agreed to take the wheel in joining the petitioner and Tina Pina on their drive. (Tr. 1:98).

The group continued on Route 130, Great Neck Road, passing officers McCabe and DeMello near the turnoff for Attaquin Park. (Tr. 1:102). As petitioner's car signaled its turn into Attaquin Park, the officers directed the car to pull over. (Tr. 1:171). Mr. Pina pulled into the lot of a nearby auto shop where he then stopped the car. (Tr. 1:171–72). As Mr. Pina pulled over, Tina Pina, who had been looking back toward the police car,

looked forward to the front seat. (Tr. 1:102–03). On the front seat, Ms. Pina saw a small handgun which, at petitioner's command, she stashed in the front of her pants. (Tr. 1:104).

When the officers approached, they ordered all occupants out of the car. The officers frisked Mr. Pina, finding no weapon. (Tr. 1:172–74). Officer McCabe then asked petitioner whether he had had a verbal confrontation at the park with Tommie Maddox. (Tr. 1:174). The petitioner confirmed that he had had such a confrontation. (Tr. 1:174). The officers then frisked LeBon, again finding no weapon. (Tr. 1:174). Tina Pina refused a pat search until a matron could be summoned to conduct the search. (Tr. 1:174). The officers then directed Tina Pina to stay beside a nearby flowerbox while awaiting the arrival of the matron. (Tr. 1:175).

While conducting a search of the vehicle, Officer DeMello noticed that Tina Pina, who had her back to the officers, was patting something in the flowerbox beside which she was standing. (Tr. 1:176). As the officers walked over to Tina Pina to investigate, they found that she had a loaded magazine of ammunition protruding from her waistband. (Tr. 1:176). Officer McCabe grabbed Ms. Pina's arms while Officer DeMello unearthed the handgun that Ms. Pina had been trying to bury in the flowerbox. (Tr. 1:177). Ms. Pina then explained to Officer McCabe that petitioner had handed her the gun. (Tr. 1:180, 221). On the basis of this information, the police proceeded to arrest the petitioner. *Id.*

## II.

### *Effective Assistance of Counsel*

Petitioner asserts that he was denied his sixth-amendment right to effective assistance of counsel during the trial because his attorney failed to investigate certain facts which petitioner believed would provide a basis for impeaching the adverse testimony of Tina Pina. Petitioner also claims that counsel's failure to call certain witnesses at trial constituted a violation of the petitioner's right to

---

2. Tina Pina and Stefan Pina are not related.

effective assistance of counsel. After explaining the applicable rule of law, we analyze each of petitioner's ineffective assistance of counsel claims.

*Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1983), provides the applicable bipartite standard for review of ineffective assistance of counsel claims. *Strickland* first requires that,

> A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.

*Id.* at 690, 104 S.Ct. at 2066. Second, this highly deferential standard requires that the petitioner show that the acts or omissions of counsel proved prejudicial to the petitioner. *Id.* at 691, 104 S.Ct. at 2066. This second element requires that a defendant show that, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.

**A. *Failures to Investigate***

**1. *Telephone Block***

 LeBon first alleges that, in violation of his right to effective assistance of counsel, his attorney failed to investigate telephone records that would have allowed counsel to impeach certain adverse testimony of Tina Pina. *See Docket Document No. 1* at 14. At trial, Tina Pina testified that approximately two weeks after petitioner's arrest, petitioner called her at home from the Barnstable House of Correction to explain that he was sorry, that he did not want her to take the blame for the gun, and that he would confess to having been in possession of the gun. (Tr. 1:111). Petitioner claims that counsel failed to investigate his claim that the telephone company had placed a service restriction on Tina Pina's telephone that prevented her from placing long-distance calls or accepting collect calls. Petitioner argues that this evidence could have been used to impeach Tina Pina's testimony by proving that petitioner

could not have placed the call to which Ms. Pina testified because the telephones at the Barnstable House of Correction permit only collect calls.

Tina Pina herself provided the explanation for the apparent incongruity of circumstance and testimony to which petitioner appeals: The petitioner had had a telephone installed in Ms. Pina's apartment under his former name, Melvin Ross, for the purpose of accepting his calls from jail. (Tr. 1:141, 150). Petitioner allegedly used this phone to speak with Tina Pina and to have Ms. Pina place three-way telephone calls to others of the petitioner's friends. (Tr. 1:139). As this telephone was installed for the purpose of accepting petitioner's calls from jail, we surmise that this was not the same phone upon which the telephone company had allegedly placed the service restriction from one year prior to petitioner's incarceration. Moreover, we cannot imagine how the $926.43 January phone bill presented in court could have been generated from a phone which had a block on collect calls and long-distance service. (Tr. 1:139). Instead, the evidence suggests that petitioner discovered the block on Tina Pina's phone when he attempted to call her from jail, solving this problem by having a new phone installed under a former name.

If counsel failed to play along with petitioner's attempt to deceive the court, counsel ought properly to be commended, having served the court much better than his client serves himself. Instead, counsel used the testimony regarding the phone bill and telephone calls to show that Tina Pina had formed an emotional attachment to the petitioner sufficiently strong that petitioner's subsequent return to Ramona Cardoza may well have spawned resentment in Tina Pina that would motivate her to lie in court. (Tr. 138–47). Counsel is guilty of nothing more than clever strategy, thorough investigation of the facts, and strong moral character. We cannot say as much for the petitioner.

**2. *Inventory of Vehicle***

Petitioner also alleges that, had counsel investigated the police records of the invento-

ry search conducted on petitioner's automobile, his attorney would have discovered that neither the fan nor the popsicles that petitioner and Tina Pina allegedly purchased in Falmouth were found in the car at the time the inventory search was conducted. *See Docket Document No. 1* at 14. LeBon argues that effective assistance of counsel entailed use of this evidence to impeach Tina Pina's testimony that she and petitioner traveled to Falmouth to purchase a fan and some popsicles. The trial transcript shows, however, that on cross-examination, Officer McCabe testified that he did not remember finding these items in the vehicle when it was inventoried and that neither of these items appeared on the police inventory sheet. (Tr. 1:202–03). Immediately following Officer McCabe's testimony on this matter, counsel then pointed out, by means of a rhetorical question, how this evidence tended to impugn the veracity of Tina Pina's testimony before the court. (Tr. 1:203). The claim that counsel failed to develop this theory of impeachment is, therefore, factually incorrect.

## B. *Failures to Call Witnesses*

### 1. *Failure to Call Rebecca Pires to the Stand*

■ LeBon asserts that his right to effective assistance of counsel was again breached when his attorney failed to seek a recess or continuance of trial to accommodate the late arrival of a scheduled defense witness, Mrs. Pires.[3] *See Docket Document No. 1,* at 11. Mrs. Pires has submitted an affidavit that, had she arrived in time, she would have testified that Tina Pina and LeBon had had a bar room dispute regarding LeBon's relationship with Ramona Cardoza in which Tina Pina threatened to avenge herself in court. *Id.* at Exhibit 2.

As we have already mentioned, counsel had already thoroughly developed this theory of resentment or jealousy for purposes of impeaching Tina Pina's testimony. (Tr. 1:138–47). Under these circumstances, then, it may well have been wise trial strategy not to delay the proceedings and risk the impa-

tience of both judge and jury over a point which had already been made. To the extent that this theory was worth its while in the first instance, we cannot say that failure to await Mrs. Pires' arrival was "outside the wide range of professionally competent assistance," or risked prejudice of a magnitude that would cause us to question the outcome of the trial. *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066.

### 2. *Failure to Call Park Goers to the Stand*

■ LeBon also complains that counsel's failure to identify and call any of the park goers who had witnessed the confrontation between LeBon and Thomas Maddox constituted a violation of the petitioner's right to effective assistance of counsel. *See Docket Document No. 1,* at 12–13. Petitioner fails, however, to indicate what exonerating testimony these park goers would have provided had they been called to the stand. LeBon has not, therefore, affirmatively demonstrated prejudice such that *Strickland* requires the court to vacate for want of effective assistance of counsel.

### 3. *Failure to Call Stefan Pina as a Hostile Witness*

Likewise, we reject petitioner's claims that counsel's failure to call Stefan Pina to the stand constituted a violation of petitioner's right to effective assistance of counsel. Defense counsel did, in fact, call Stefan Pina to the stand. (Tr. 3:2). He also argued vehemently and artfully at the bench for the court to declare Mr. Pina a hostile witness. (Tr. 3:5–6, 18–22). In fact, these arguments met with partial success when the court did eventually allow defense counsel to put non-oratory, leading questions to the witness. (Tr. 3:22). The claim that defense counsel neglected to call Mr. Pina to the stand or to seek his designation as a hostile witness is, therefore, factually incorrect.

---

**3.** Mrs. Pires had called to indicate that, though she would be late, she was on her way to the courthouse. She apparently did not arrive in time to testify. *See Docket Document No. 1,* at 11.

#### 4. *Failure to Call Tina Pina's Mother to the Stand*

■ Finally, petitioner argues that counsel should have called Tina Pina's mother to the stand. *See Docket Document No. 1*, at 18. LeBon asserts that Ms. Pina's mother would have testified that LeBon had, at one time, lived with Tina Pina. She would also have testified that he had moved out of the house because Ms. Pina's grandmother did not like LeBon living in the house.

As we interpret petitioner's argument, this testimony would show that, though petitioner no longer lived in her home, Tina Pina had never rejected the petitioner. This evidence would, in turn, lend support to the theory that Tina Pina had had an emotional bond to the petitioner, the petitioner's severance of which may have spawned resentment in Tina Pina that may, in turn, have motivated her to lie in court, to the prejudice of the petitioner. As we have already noted twice, counsel thoroughly developed this theory of resentment or jealousy in the course of the trial such that we need not be concerned that the remote and tenuous evidence that would have been presented by Tina's mother would with any probability have affected the outcome of the trial.

In parting with this topic, we note that, even had the jury believed Tina Pina had a motivation to lie, they may have, nonetheless, believed that her testimony before the court was wholly truthful. The petitioner presumes, to the contrary, that proof of a motivation to lie would have automatically impeached the entirety of Ms. Pina's testimony. This additional leap of faith upon which the petitioner relies further assures us that the petitioner has not, in any of his impeachment claims, shown the "reasonable probability" of prejudice required by *Strickland*.

### III.

#### *Retroactivity of Tavares*

■ The petitioner also complains that, in violation of the rule announced in *United States v. Tavares*, 21 F.3d 1 (1st Cir.1994), the court permitted the government to introduce, over an offer to stipulate, evidence demonstrating that LeBon's prior felony con-

viction involved use of a firearm. *Tavares* does provide that there must be adequate trial court findings that the probative value of evidence regarding the nature of a prior felony conviction outweighs the risk of unfair prejudice from the introduction of that evidence where the defendant is charged as a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). *Id.* at 5. The government responds that, at the time petitioner was tried, the rule of *United States v. Collamore*, 868 F.2d 24 (1st Cir.1989), permitted the government to reject an offer to stipulate in order to introduce evidence of the nature of a prior felony conviction when prosecuting a felon in possession of a firearm.

The question now before the court is whether the new rule announced in *Tavares* should be retroactively applied on collateral review to cases originally decided under *Collamore*. The government contends that *United States v. Melvin*, 27 F.3d 703, 706–07 n. 4 (1st Cir.1994), limits the retroactive application of *Tavares* to cases "pending on direct review" at the time the new rule was announced. Since the Court of Appeals announced the rule of *Tavares* after it had decided LeBon's appeal, the government argues that the rule of *Collamore* correctly governs this case. Unfortunately, the rules of retroactivity provided by the Supreme Court are not so simple.

The *Melvin* court relied on *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), for the proposition that new rules of criminal procedure should have retroactive effect upon all cases pending on direct review. *Griffith* does not, however, purport to provide the same rule for cases under collateral review. In his *Griffith* concurrence, Justice Powell observed that,

> As the cases we decide today involve only retroactivity of decisions pending on direct review, it was not necessary for the Court to express an opinion with respect to *habeas corpus* petitions. As I read the Court's opinion, this question is carefully left open until it is squarely presented. It is to be hoped that the Court then will adopt the Harlan view of retroactivity in cases seeking relief on habeas petitions. *See Mackey v. United States, supra,* 401 U.S. [667]

at 681–695, 91 S.Ct. [1160] at 1174–1181 [28 L.Ed.2d 404 (1971)]. Under that view, habeas petitions generally should be judged according to the constitutional standards existing at the time of conviction. *Griffith,* 479 U.S. at 329, 107 S.Ct. at 716. Justice Powell's hopes were realized when, in *Teague v. Lane,* 489 U.S. 288, 290, 109 S.Ct. 1060, 1063–64, 103 L.Ed.2d 334 (1989), the Court adopted the retroactivity rule employed by Justice Harlan in *Mackey.* That rule provides that a new constitutional rule of criminal procedure should not be applied retroactively to cases on collateral review unless the new rule (1) places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe, or (2) it requires the observance of those procedures that are implicit in the concept of ordered liberty. *Teague,* 489 U.S. at 290, 109 S.Ct. at 1063–64.

LeBon contends that the second of the *Teague* exceptions applies to this case. We agree. Harlan derived the second of the *Teague* exceptions from Justice Cardozo's opinion in *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). *Palko* explains that procedures implicit in our notion of ordered liberty include those that are "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* at 325, 58 S.Ct. at 152. As noted in *Butler v. McKellar,* 494 U.S. 407, 416, 110 S.Ct. 1212, 1218, 108 L.Ed.2d 347 (1990), however, *Teague* expressly warns against a literal application of the *Palko* language, for fear of "importing into a very different context the terms of the debate over incorporation;" instead, *Teague* reconfigures the *Palko* analysis to an approach that requires retroactivity for those new procedures "without which the likelihood of an accurate conviction is seriously diminished." *Id.; Teague,* 489 U.S. at 290, 109 S.Ct. at 1063–64.

*Tavares* itself explains that, in revising the rule of *Collamore,* the court intended to reduce the substantial risk of unfair prejudice arising from the introduction of evidence of prior firearm felonies in a 18 U.S.C. § 922(g) prosecution. The *Tavares* court reasoned that,

[t]he fact that defendant's prior conviction involved the unlawful acquisition of a firearm could not help but influence the jurors' attitude toward his claim that, this time, someone else had the gun.

*Tavares,* 21 F.3d at 6 (1994).

This language strongly suggests that the *Tavares* court deemed its new rule to have corrected a condition in the law which threatened to produce inaccurate convictions even under the most conscientious of juries; consequently, we deem the rule of *Tavares* to apply retroactively on collateral review.

■ Though the rule of *Tavares* would squarely have prohibited the evidence regarding the nature of LeBon's prior felony conviction, we must, nonetheless, consider whether the error was harmless in light of the overall evidence of petitioner's guilt. *U.S. v. Lewis,* 40 F.3d 1325 (1st Cir.1994); *Melvin,* 27 F.3d at 708. It stretches the imagination and exceeds the bounds of credibility to suppose that the events of that August afternoon in Mashpee, Massachusetts, could have been the combined product of happenstance and a deliberate conspiracy between police officers, park officials, and park goers. The evidence strongly suggests that, to the contrary, the petitioner was caught red-handed in the midst of his attempt to conclude a vehement argument with the aid of a gun that he had retrieved from the house in which he was then living. Had the jury never learned that LeBon's prior felony conviction involved a firearm, we have no doubt that the jury would still have returned the same verdict based on the other evidence presented at trial. We conclude, therefore, that petitioner's conviction should not be overturned by the fortuity of intervening legal advances, the beneficial effect of which he does not properly deserve.

## IV.

### *Prosecutorial Misconduct*

■ LeBon also claims that several instances of alleged prosecutorial misconduct provide a basis for reversing his conviction. Though claims of prosecutorial misconduct are cognizable under federal habeas corpus review, *Darden v. Wainwright,* 477 U.S. 168,

106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), the misconduct must "so infect the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974); *United States v. Lilly,* 983 F.2d 300, 307 (1st Cir. 1992). We proceed, then, to review petitioner's claims, each in turn, both for factual support in the record and prejudice that amounts to a denial of due process.

■ Petitioner first alleges that Assistant United States Attorney Tuteur's reference, during closing arguments, to statements of Stefan Pina that Officer McCabe claims to have overheard but which Pina denies having made, constituted improperly submitted personal opinion of the evidence.[4] The government properly notes in its opposition to the petitioner's motion for relief that the statements to which Mr. Tuteur referred are contained in the sworn testimony of Officer McCabe. *See Docket Document No. 11,* at 15. Though Stefan Pina denies having made these statements, it is the role of the jury, not the petitioner, the witness, or the court, to determine which witness has testified truthfully regarding the disputed issue. *See United States v. Winter,* 663 F.2d 1120, 1132 (1st Cir.1981); *United States v. Martorano,* 663 F.2d 1113, 1120 (1st Cir.1981); *United States ex. rel. Burnett v. Illinois,* 619 F.2d 668, 674 (7th Cir.), cert. denied, 449 U.S. 880, 101 S.Ct. 229, 66 L.Ed.2d 104 (1980). We conclude that, because it was based on witness testimony, Mr. Tuteur's reference to the statements of Stefan Pina constitutes neither a personal opinion of the evidence nor a reference to matters not in evidence.

Likewise, Mr. Tuteur did not improperly state a personal opinion of the petitioner's guilt or refer to matters not in evidence when he suggested to the jury in his closing argument that LeBon had gone to Mrs. Cardoza's house to get his gun. (Tr. 4:10). At the time this statement was made, Mr. Tuteur was presenting the prosecution's theory of how the gun came to be found in the car by Ms. Pina. The statement was not a statement of personal opinion so much as a description of how all of the evidence presented at trial could plausibly place petitioner in possession of the gun. (Tr. 4:10). Though no one testified to having seen petitioner leave Ms. Cardoza's house with the gun, Mr. Tuteur's inference was a reasonable one made in good faith. It is precisely this type of reasonable inference that prosecutors are allowed to make in painting a picture of events that show the petitioner culpable. *United States v. Tipton,* 964 F.2d 650, 656 (7th Cir.1992).

■ LeBon also alleges that Mr. Tuteur deliberately misled the jury into believing that Stefan Pina was never a government witness. In fact, Mr. Tuteur did state that Stefan Pina did not appear at trial as a government witness. (Tr. 4:12-13). This statement does seem to conflict with Stefan Pina's testimony that the government had granted him immunity with an understanding that,

> [i]f I told them what happened in the car that day, just what happened, not to say who had the gun or anything, just what happened from when he picked me up to when I got arrested, that is it, and then they won't charge me for it.

---

**4.** Petitioner's motion before the court contains language which may be interpreted to state a generalized claim that the prosecuting attorney offered his personal opinion on the evidence throughout the trial. Petitioner states, for example, that "he was unfairly prejudiced by the prosecutor's remarks during the whole trial when the prosecutor gave his own opinion of the evidence." *See Docket Document No. 12,* at 22. To the extent that this allegation reaches beyond those specific instances of misconduct cited by the Petitioner, we deem Petitioner's lack of specificity to constitute a failure to state a claim upon which relief may be granted. Only claims of prosecutorial misconduct pleaded with factual specificity must be considered on collateral review, for the court would otherwise find itself unable to make the required determination of whether the alleged prosecutorial misconduct prejudiced the Petitioner's case. *United States v. Neal,* 36 F.3d 1190, 1208 (1st Cir.1994); *United States v. Butt,* 731 F.2d 75, 77 (1st Cir.1984); *United States v. Holt,* 817 F.2d 1264, 1275 (7th Cir.1987); *Taylor v. Cardwell,* 579 F.2d 1380, 1383 (9th Cir.1978). We are to proceed, then, with those claims of prosecutorial misconduct alleged with the requisite particularity. *Thomas v. Metropolitan Life Ins.,* 40 F.3d 505, 511 n. 8 (1st Cir.1994).

(Tr. 3:36). On cross-examination by the government, however, Mr. Pina testified that he had no understanding that the government would not prosecute, merely that his testimony could not be used against him if charged. (Tr. 3:40). Whichever of these two agreements was the actual understanding between Mr. Pina and the government, we believe that the jury must certainly have understood that Mr. Pina may have had a motive to lie.

Mr. Tuteur made no attempt to mischaracterize the arrangement between Mr. Pina and the government; instead, he attempted to show that Mr. Pina's friendship with LeBon had a countervailing effect that would have motivated Mr. Pina to lie to the benefit of his friend. (Tr. 4:12–13). Mr. Tuteur points to Mr. Pina's reluctance to testify as proof of loyalty to his friend. (Tr. 4:12). He also argued that this friendship, combined with the fact that the defense called Mr. Pina to testify, justified labeling Mr. Pina a witness for the defense. (Tr. 4:13).

Mr. Tuteur's argument strikes us as neither wholly ingenuous nor wholly specious. Defense counsel explained at the bench that he called Mr. Pina to the stand with the hope of using prior inconsistent statements to impeach Mr. Pina's testimony, arguing vehemently that the witness be declared hostile. (Tr. 3:5–6, 18–22). After witnessing this argument, we question whether it was wholly ingenuous to suggest to the jury that Mr. Pina was called to the stand by the defense with the hope of procuring testimony favorable to the petitioner.

On the other hand, Mr. Tuteur's arguments regarding Mr. Pina's friendship with LeBon seem adequately supported by the evidence to have been made in good faith. Stefan Pina was, in fact, a reluctant witness against LeBon, and there was, evidently, courtroom signaling between Mr. Pina on the stand and the petitioner that suggested coordinated testimony. (Tr. 4:12). As Mr. Tuteur's argument for labeling Mr. Pina a "defense witness" did not rest entirely on the fact that Mr. Pina was called by the defense, we cannot say that the label of "defense witness" was made in bad faith.

Moreover, whatever misleading tendency the label "defense witness" may have had, both sides had presented the evidence underlying this issue to the jury on both direct- and cross-examination. It was then the jury's duty to determine whether Mr. Pina's testimony was to be trusted. Having presented the jury with the evidence necessary to make their assessment of Mr. Pina's trustworthiness, the prejudicial effect of mislabelling the witness would, indeed, prove minimal—certainly not the type of grossly unfair prejudice that would constitute a denial of due process.

## V.

### Confrontation Clause

■ The petitioner alleges that the court violated his sixth-amendment right to confront adverse witnesses when the court granted an *in limine* motion to prevent the defense counsel from going into past criminal charges filed against Tina Pina. The government correctly notes that Fed.R.Evid. 609 permits impeachment only by evidence of a conviction, not by evidence of criminal charges. As "[t]he relevant charges against Tina Pina had each resulted in a 'not guilty' finding or were continued without a finding and subsequently dismissed," there is no conviction on the basis of which Ms. Pina's character for truthfulness may be impeached. *Docket Document No. 11*, at 17. The government also correctly notes that the remaining continuation without a finding from the state court does not amount to a "conviction" for purposes of Rule 609.[5] The motion *in limine* was, therefore, properly granted and the collateral attack is now groundless.

Next, LeBon argues that it was reversible error for the court to have prevented defense counsel from questioning Tina Pina regard-

---

5. *Arnold v. Panora*, 593 F.2d 161, 163 n. 4 (1st Cir.1979), explains that a continuation without a finding provides a pre-conviction probationary period. If the defendant satisfies the terms of probation, the government may choose to drop charges. Because a continuation without a finding does not constitute a final disposition of the case, *United States v. Roberts*, 39 F.3d 10, 11 (1st Cir.1994), we agree with the government that such a continuation does not constitute a conviction for purposes of Fed.R.Evid. 609. *Accord United States v. Phillips*, 732 F.Supp. 255 (D.Mass.1990).

ing her relationship with LeBon, because this evidence would have demonstrated that Ms. Pina had a motive to lie to the court and jury. In fact, defense counsel did thoroughly develop, during his cross-examination of Ms. Pina, the theory that LeBon's relationship with Ramona Cardoza generated resentment in Ms. Pina that may have motivated her to lie. (Tr. 1:139–47). The petitioner's claim is, therefore, factually groundless and, accordingly, denied.

## VI.

### *Evidentiary Hearing*

The First Circuit requires that, "[w]hen a petition is brought under section 2255, the petitioner bears the burden of establishing the need for an evidentiary hearing." The widely employed test provides that a

[section] 2255 motion may be denied without a hearing as to those allegations which, if accepted as true, entitle the movant to no relief, or which need not be accepted as true because they state conclusions instead of fact, contradict the record, or are "inherently incredible." *Shraiar v. United States,* 736 F.2d 817, 818 (1st Cir.1984); *Mack v. United States,* 635 F.2d 20, 26–27 (1st Cir.1980).

Having reviewed the trial transcript, we deem that in each instance, petitioner's claims fall within at least one of these exceptions to the hearing requirement; accordingly, we deny the petitioner's request for an evidentiary hearing.[6]

## VII.

### *Conclusion*

Petitioner's section 2255 motion to vacate is **DENIED without a hearing.**

**IT IS SO ORDERED.**

---

**6.** Petitioner's claims regarding the failure to check the vehicle inventory, failure to call Stefan Pina to the stand, and failure to allow inquiry into Tina Pina's motivation to lie are all contradicted by evidence in the record. Similarly, petitioner's generalized claims that the prosecutor improperly offered his opinion regarding petitioner's guilt and defense counsel's failure to call any of the park goers to the stand both state conclusions instead of fact; in both claims, petitioner has failed to show prejudice by particular allegations of fact. All of the petitioner's remaining claims afford no relief to the petitioner as a matter of law, even if we accept petitioner's allegations of fact as true.