

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 18, 2017 at Knoxville

**STATE OF TENNESSEE v. YELSIN A. CRUZ**

**Appeal from the Circuit Court for Maury County**
**No. 22553     Robert L. Jones, Judge**

_____

**No. M2016-01099-CCA-R3-CD**

_____

The defendant, Yelsin A. Cruz, appeals his Maury County Circuit Court jury conviction of rape of a child, claiming that the trial court erred by denying his motion to suppress his pretrial statement to the police, that the evidence was insufficient to support his conviction, and that the 27-year sentence is excessive. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Jacob J. Hubbell, Columbia, Tennessee, for the appellant, Yelsin A. Cruz.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Mike Bottoms, District Attorney General; and Daniel J. Runde, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Maury County Grand Jury charged the defendant with one count of rape of eight-year-old P.M.P.[1]

At the November 2015 trial, Maury County Sheriff's Department Detective Johnny Luttrell testified that on April 24, 2013, he responded to the Emergency Department at Maury County Regional Hospital, where he spoke with the victim. As a result of that conversation, Detective Luttrell asked another officer to bring the defendant to the sheriff's department for questioning. Detective Luttrell provided the defendant with *Miranda* warnings, and the defendant executed a written waiver of his constitutional

---

[1]As is the policy of this court, we utilize the minor victim's initials.

rights. Upon questioning by Detective Luttrell, the defendant provided an oral statement. Because the defendant could not write very well in English, Detective Luttrell wrote the statement and then read it back to the defendant, who then signed it. Detective Luttrell read the statement to the jury:

> "I was laying in the be[]d watching TV, and [the victim] came in the bedroom. She had no clothes on. She had a towel on, but was open. [The victim] got into the bed with me. She pulled my pants down. She started touching me and hugging me and my d*** went up. She got on top of me and jumped down on me. My d*** went up in her and I let her do that. This was written for me by Detective Luttrell."

In addition to recording the statement in writing, Detective Luttrell audio recorded his interview with the defendant. That recording was exhibited to the trial and played for the jury. During the interview, the defendant said that he told the victim, "No," but she continued to jump on him. He said that "[s]he wanted it." At some point, the defendant said that the victim "told him to come back that she was bleeding." The defendant told the detective that the victim had moved her towel as though "[s]he was trying to show off her body to him." After the defendant provided his statement, Detective Luttrell had another officer transport the defendant to the jail while he obtained a warrant for the defendant's arrest.

Detective Luttrell took photographs and retrieved evidence from the residence where the offense occurred. In particular, he photographed a white shirt and a towel that lay on the defendant's bed, both of which had "brownish red" stains. He collected both the towel and the shirt from the residence. He collected the victim's underwear and shirt from her mother at the hospital. He recalled that the bedding was wet underneath the towel but said that he did not collect the bedding. Detective Luttrell obtained DNA samples from both the defendant and the victim and took them, along with the victim's clothing and the shirt and towel collected from the residence, to the Tennessee Bureau of Investigation ("TBI") for forensic testing.

During cross-examination, Detective Luttrell acknowledged that he did not obtain the services of an interpreter or other person who spoke Spanish to assist him in interviewing the defendant. He recalled that an employee of the sheriff's department was fluent in Spanish, but he did not contact that person to help him communicate with the defendant. He said that there were occasions during the interview when the defendant indicated that he did not understand certain of the detective's questions. Detective Luttrell agreed that before he suggested to the defendant that the victim "wanted it," the defendant had denied having any physical contact with the victim. Detective Luttrell said

that he interviewed the victim, the victim's mother, and the defendant and that he did not interview any other person.

During redirect examination, Detective Luttrell insisted that he and the defendant were "able to communicate" despite the language difference.

TBI Agent and Forensic Scientist Greg Fort testified that he performed forensic testing of the victim's underwear, her yellow shirt, a towel, and a white polo shirt. Testing did not indicate the presence of semen on the white shirt. Semen was present on the towel, and DNA testing established that it came from the defendant. Agent Fort did not find semen on the victim's panties or shirt. He did not perform any tests to determine whether there was blood on any of the items. He did not receive a "sexual assault kit" for testing.

Leigh Anne Pickup, a physician's assistant at Maury County Regional Hospital, testified that she treated the victim when the victim was brought in to the emergency department. She recalled that the victim's primary complaint was vaginal bleeding and that the victim claimed that "she sat on a plant at school." The victim told Ms. Pickup that she had bathed after school and then gone to her grandparents' house. Ms. Pickup recalled that the victim "was obviously complaining of some pain and was concerned about this bleeding, but remained active and did smile during her exam." Upon examining the victim, Ms. Pickup found that the victim "had a tear at the posterior vaginal introitus, meaning, . . . the lowest part of the vagina closest to the anus." The victim also had "bruising around the introitus."

Because of the extent of the victim's injuries, Ms. Pickup asked for assistance from her attending physician, Doctor Omar Hamada. Doctor Hamada ordered testing and then repaired the laceration to the victim's vagina "under conscious sedation." Ms. Pickup said that the victim's injury was "not consistent with . . . falling on a plant" or a stick. She said that the injury required "penetration into the vagina." As he repaired the victim's injury, Doctor Hamada examined the victim's hymen and discovered that "[t]he hymen was torn at the 6:00 position two to three centimeters, a second-degree perineal laceration in midline through vaginal introitus." Based upon these findings, Ms. Pickup surmised that the victim's injuries were the result of a sexual assault. Ms. Pickup then telephoned the police and "Our Kids, which is an intermediary organization that helps facilitate care of children that are" in danger.

During cross-examination, Ms. Pickup testified that the victim did not indicate to her that the defendant had caused the injuries. Ms. Pickup said that any object penetrating the victim's vagina "could have caused the laceration, but there had to be significant impact to cause the bruising surrounding the vagina."

Doctor Omar Hamada testified that he examined the victim on April 24, 2013. He recalled that the victim was initially "very reluctant to be examined" and that "her story seemed to change a little bit depending on who questioned her." At that point, Doctor Hamada decided to sedate the victim to perform a more thorough examination. During that examination, he observed "a traumatic laceration" to the victim's "posterior vaginal fourchette," explaining that "the laceration was from inside the vagina down around the outside opening into the perineal area." He said that the victim was "bleeding profusely" from her vagina. Doctor Hamada also observed that the victim's "[h]ymen was torn traumatically," and he agreed that penetration by an adult penis could have caused the victim's injuries. Doctor Hamada noted bruising around the victim's vagina "'on either side of'" the laceration.

Doctor Hamada testified that he did not order collection of a rape kit because he did not observe any pubic hair or seminal fluids during his examination of the victim's vagina. He opined that the victim's injury was caused by "a direct hard force," explaining, "It wouldn't be something that just accidentally happened or something that was gentle. . . . [I]t would require a pretty traumatic event." He said that the victim's injuries were "[n]ot at all" consistent with the victim's having fallen on a plant. He said that "a penetrating type injury . . . caused those results."

Brandy Suarez, the victim's mother, testified that the defendant lived with her and the then eight-year-old victim in a mobile home behind the home owned by Ms. Suarez's parents, Ruby and Jimmy Aslinger. Ms. Suarez's son lived with Mr. and Ms. Aslinger. On April 24, 2013, Ms. Suarez woke up at 5:00 a.m. to get ready for work and woke the victim at the same time. At 5:30 a.m., Ms. Suarez left for work and took the victim to the Aslingers' house to catch the bus. The defendant, who worked as a roofer, did not work that day because it was raining. When Ms. Suarez returned home that afternoon, she saw the victim standing on the back porch of their mobile home crying. Initially, the victim would not tell Ms. Suarez why she was crying. After putting away her groceries, Ms. Suarez prepared to take the victim to the Aslingers' house so that the victim could attend church with them. The defendant offered to take her instead, which struck Ms. Suarez as odd "because he's never done that before."

Less than two minutes later, Mr. Aslinger telephoned and told her that she "needed to come down to the house that there was something wrong with" the victim. Ms. Suarez drove the short distance to the Aslingers' house and walked "straight to the back to the bathroom where [the victim] was." When the victim stood up, "the blood was just pouring out." The victim told Ms. Suarez that "she fell at school on a stick." Ms. Aslinger gave the victim clean underwear and gave the victim a sanitary napkin to wear. Ms. Aslinger then "took the other underwear that she had on, because it was full of blood,

to put it in the washer." Ms. Suarez then drove the victim to the hospital, and the defendant went with them. She recalled that the defendant "acted as though he didn't know what was wrong with her. He acted concerned." Once at the hospital, the victim was taken immediately for an examination, and Ms. Suarez had no further opportunity to speak with the defendant that day.

Ms. Suarez said that the victim continued to insist that she had fallen at school but changed her story to say that she had fallen on the playground. The victim refused all attempts to examine her, so "[t]hey had to sedate her." When the victim awoke later, she told Ms. Suarez how she came to have the injury, and Ms. Suarez shared that information with the police. Ms. Suarez said that she had not initially suspected that the victim's injuries were caused by sexual assault, explaining that she believed the victim had injured herself accidentally. She recalled that she had observed the victim with a water bottle "down on her private part" approximately one month prior.

Ms. Suarez said that the white shirt that Detective Luttrell collected from the defendant's bedroom was the victim's "school shirt."

During cross-examination, Ms. Suarez said that on the day of the offense, the victim had gotten off the bus at the Aslingers' house, as she typically did. She recalled that when she initially asked the defendant why the victim was upset, the defendant told her "that he thought maybe she got in trouble down at granny's." Ms. Suarez said that when she observed the victim with the water bottle near her vagina, the victim "didn't have it inserted or anything like that."

The victim testified that on the day of the offense, she rode the bus home from school and went to the Aslingers' house. She played video games with her 11-year-old brother for a short time before her grandparents sent her to her own residence to take a bath and get ready for church. When she got home, the defendant was in the living room watching television. While she was in the bathtub, the defendant walked in and stood in front of the bathtub. The defendant then took her out of the bath and laid her on the bed. The victim said that the defendant then "put his private part into my private part." She recalled that her "private part started bleeding," and she "started yelling for [her] mom." When the victim told the defendant that she was bleeding, he stopped. The victim said that she then went to finish her bath, and the defendant "started cleaning the bed" with "a hair straightener, shampoo, and a hair dryer." She recalled that the defendant "said that it was okay that [she] was bleeding, because [her] mom bleeds, too."

The victim dressed for church and went out the back door of the mobile home. The victim said that she became upset when she saw her mother but that she did not tell her mother what had happened because she "was scared." She recalled that her

mother was going to drive her to the Aslingers' house, but the defendant offered to do so instead.  She said that when she arrived at the Aslingers', she went directly to the bathroom and saw that she was "pouring out blood."  She sat down on the toilet and "hollered out to granny" to come to the bathroom.  After Ms. Aslinger saw that the victim was bleeding, Ms. Aslinger asked Mr. Aslinger to telephone Ms. Suarez.  Ms. Suarez then cleaned the victim up and took her to the emergency room.  The defendant rode with them.  The victim said that in the hospital waiting room, the defendant told her "not to tell on him."

The victim recalled being examined and being sedated so that the doctor could "stitch [her] up."  She said that after she woke up, she told her mother that the defendant had hurt her.  The victim denied injuring herself.

The defendant testified that he began dating Ms. Suarez four and a half years before the offense and that they began living in the mobile home near the Aslingers' residence approximately a year and a half prior to the offense.[2]  He said that he did not spend much time with the Aslingers or with the victim because he worked long hours.  He recalled that he did not work on the day of the offense because it was raining.  He said that the victim came home that day at approximately 4:00 p.m., which he described as unusual, explaining that Ms. Suarez generally picked the victim up from the Aslingers' house, and the two came home together.  He said that the victim told him "that she was mad with the grandparents."  The victim went to take a bath, and he remained in the living room.  The defendant denied going into the bathroom while the victim was bathing, saying, "I have not taken her out of the bathtub, and I haven't even gone into the room."  The defendant said that the victim got out of the bath, dressed, and went outside.  When Ms. Suarez arrived, the defendant offered to take the victim to the Aslingers' house while Ms. Suarez prepared dinner.  He recalled that the trip took him "all of one to two minutes."  As soon as he arrived home, Ms. Suarez came out the back door and said that she needed to go to the Aslingers'.

The defendant said that Ms. Suarez returned to the residence a short time later, told him that she was taking the victim to the hospital, and asked him if he wanted to go with them.  He recalled that he and Ms. Suarez communicated via text message while the victim was being treated and that, eventually, Ms. Suarez told him that the police were coming to talk to him.  An officer came into the waiting area, handcuffed him, and placed him in a patrol car.  The officer drove him to the jail, where he was interviewed by Detective Luttrell.

---

[2] The defendant testified through an interpreter.

The defendant, a native of Honduras, said that he only attended school through the fifth grade while living in Honduras and that he had never taken an English class. He said that he tried to learn and speak some English since coming to America in 2008. He testified that he communicated with Ms. Suarez and the victim exclusively in Spanish. The defendant said that all of the police officers communicated with him in English, which made it difficult for him to understand what they were saying. He said that he did not feel free to leave during the interview. The defendant acknowledged having told Detective Luttrell that the victim had jumped on him, causing his penis to penetrate her vagina, but he claimed that he did so because he "felt intimidated" by the detective's questioning and "finally just had to tell him what he wanted to hear." He said that he "wanted . . . to be able to just go home" and that he "thought [Detective Luttrell] was going to let" him do so after he provided the statement. He explained, "I never thought that I was going to get in any kind of trouble with the police."

The defendant adamantly denied raping the victim. He said that his semen was deposited on the towel when he cleaned himself with it after he and Ms. Suarez had sex.

Based upon the foregoing proof, the jury convicted the defendant as charged. Following a sentencing hearing, the trial court imposed a sentence of 27 years to be served at 100 percent by operation of law.

In this timely appeal, the defendant asserts that the trial court erred by denying his motion to suppress his pretrial statement to Detective Luttrell, that the evidence was insufficient to support his conviction, and that the sentence imposed by the trial court was excessive. We consider each claim in turn.

*I. Suppression*

The defendant asserts that the trial court erred by denying his pretrial motion to suppress the statement he made to Detective Luttrell, claiming that his insufficient command of English prevented his providing a knowing and voluntary waiver of his constitutional rights. The State contends that the trial court did not err.

At the hearing on the defendant's motion, Detective Luttrell testified much as he did later at trial. Detective Luttrell said that the defendant was placed in handcuffs at the hospital and transported to the sheriff's department in handcuffs. Before he began questioning the defendant, Detective Luttrell provided the defendant with *Miranda* warnings, and the defendant signed a written waiver of his constitutional rights. Detective Luttrell said that he and the defendant communicated in English and that the defendant did not appear to have any difficulty speaking with the detective. Detective

Luttrell said that he wrote out the defendant's statement "[b]ased on what [the defendant] told" him "throughout the interview" after the defendant "said that he could not write good English." Detective Luttrell made an audio recording of the interview that was exhibited to his testimony at the hearing.

During cross-examination, Detective Luttrell agreed that English was not the defendant's first language and that the defendant was most fluent in Spanish. He also agreed that the defendant's English was somewhat broken. He said that there were other officers at the sheriff's department who spoke Spanish and that if he had believed "that what [he] was trying to say was not being effectively translated or communicated to the" defendant, he would have asked for help from a Spanish-speaking officer. He said that he did not believe that the defendant had any difficulty communicating with him. Detective Luttrell testified that he only interviewed the defendant one time.

The defendant testified that he was born in Honduras and lived there until he came into the United States when he was 15 or 16 years old.[3] He said that he attended school for six years in Honduras but did not learn any English at school. He said that he did not take any English classes in the United States but had picked up some English while working. The defendant maintained that Detective Luttrell did not read the rights waiver form to him before the interview and that he did not, in fact, sign the waiver form until the following morning when officers came to take a DNA sample. He added that he only signed the form because Detective Luttrell "told [him] to write that on there." The defendant said that Detective Luttrell had interviewed him "about three times." He claimed that the detective did not interview him immediately following his arrest, as the detective claimed, but that he had "spent the whole night in [the interview] room" before being asked to sign the rights waiver and other documents on the following morning.

The defendant agreed that Detective Luttrell had advised him of his constitutional rights but said that he "didn't understand a lot of what he was saying." He explained, "I don't speak much English. I mean, I do. I can say a few words here and there and things like that, but I don't even speak it correctly. You really have to pay attention to what I'm saying and put some thought into it to . . . make out what I'm saying."

During cross-examination, the defendant agreed that it was his voice in the audio-recorded interview with Detective Luttrell. He said that he spoke in English to Detective Luttrell because he did not know whether the detective "would be able to speak a few words or not."

---

[3] The defendant testified through an interpreter.

In a written order, the trial court[4] found that the defendant "speaks English with an accent and at times seems to struggle with certain English Words"; that "he could not read or write in English"; that he "understood and spoke English sufficiently to respond to the questions he was asked by Detective Luttrell"; that he "understood and spoke English sufficiently to converse almost 44 minutes with Detective Luttrell"; that Detective Luttrell provided the defendant with *Miranda* warnings; that he "understood and spoke English sufficiently to intelligently, knowingly and voluntarily waive his right to remain silent and his right to counsel"; that he "understood and spoke English sufficiently to provide the statement" to Detective Luttrell; and that "the totality of the circumstance[s] demonstrates that [the defendant] intelligently, knowingly and voluntarily waived his right to remain silent and right to counsel." Based upon these findings, the trial court denied the defendant's motion to suppress his statement.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn.2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding "the Fifth Amendment's exception from compulsory self-incrimination" applicable to the states through the Fourteenth Amendment). This means that, to pass federal constitutional muster and be admissible at trial, a confession must be free and voluntary and not "'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, . . . nor by the exertion of any improper influence'" or police overreaching. *Bram v. United States*, 168 U.S. 532, 542-43 (1897) (citation omitted). The rule is equally applicable to confessions given during custodial interrogations following appropriate provision of *Miranda* warnings, *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980), and those provided before the defendant has been placed in custody, *see Arizona v. Fulminante*, 499 U.S. 279, 286-88 (1991). To determine voluntariness, the reviewing court must examine the totality of the circumstances surrounding the confession to determine "whether the behavior of the State's law enforcement officials

---

[4]The defendant's motion was heard and denied by Judge Robert L. Holloway, Jr. Following Judge Holloway's appointment to this court, Judge Robert L. Jones presided over the defendant's case until its conclusion.

was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined – a question to be answered with complete disregard of whether or not [the defendant] in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961).

Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citing *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994)); *see also State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005). "The critical question is 'whether the behavior of the state's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *Smith*, 933 S.W.2d at 455-56 (quoting Kelly, 603 S.W.2d at 728 (internal citation and quotation marks omitted)).[5]  Moreover, because of the extra protection afforded by the state constitution, "[f]or the relinquishment of rights to be effective, the defendant must have personal awareness of both the nature of the right and the consequences of abandoning his rights." *Thacker*, 164 S.W.3d at 249 (citing *Stephenson*, 878 S.W.2d at 544–45). Accordingly, "the totality of the circumstances must reveal 'an uncoerced choice and the required level of comprehension before a court can properly conclude that Miranda rights have been waived.'" *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000) (quoting *Stephenson*, 878 S.W.2d at 545; *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

An accused "may knowingly and intelligently waive the right against self-incrimination only after being apprised of" the constitutional rights to remain silent and to counsel during interrogation. *Thacker*, 164 S.W.3d at 248. As with the voluntariness of a statement, the trial court "may conclude that a defendant voluntarily waived his rights if, under the totality of the circumstances, the court determines that the waiver was uncoerced and that the defendant understood the consequences of waiver." *Id.* (citing *Stephenson*, 878 S.W.2d at 545). "Language difficulties encountered by a defendant are considered in determining if there has been a valid waiver." *State v. Van Tran*, 864 S.W.2d 465, 473 (Tenn. 1993) (citing *United States v. Hernandez*, 913 F.2d 1506, 1509-10 (10th Cir. 1990); *United States v. Boon San Chong*, 829 F.2d 1572, 1574-75 (11th Cir. 1987); *Perri v. Director, Dep't of Corrs., State of Illinois*, 817 F.2d 448, 452-53 (7th Cir. 1987); *United States v. Bernard S.*, 795 F.2d 749, 751-53 (9th Cir. 1986); *United States v. Short*, 790 F.2d 464, 469 (6th Cir. 1986)). Although "a 'limited ability to understand

---

[5]This test is exactly the same as that promulgated in *Rogers*, so it is not entirely clear that it actually effectuates the stated goal of providing more protection to the criminally accused.

English'" has the potential to "'render a waiver of rights defective,'" a limited understanding of English, standing alone, is not dispositive. *United States v. Moreno*, 122 F. Supp. 2d 679, 681 (E.D. Va. 2000) (quoting *United States v. Guay*, 108 F.3d 545, 549 (4th Cir. 1997)). A trial court's finding that the defendant is entitled to the services of an interpreter during court proceedings "is not inconsistent with" a finding that the defendant effected a knowing, intelligent, and voluntary waiver of his constitutional rights. *Van Tran*, 864 S.W.2d at 473 (citing *United States v. Abou–Saada*, 785 F.2d 1, 10 (1st Cir.1986)).

The claim presented by the defendant with regard to the voluntariness of his rights waiver and his statement mirrors those presented by the defendant in *Van Tran*. There, the Vietnamese Van Tran argued that "his knowledge, understanding and comprehension of the English language is limited, and his understanding of legal terms is so poor that he was unable to make a knowing and intelligent waiver of his constitutional rights to remain silent and to have the assistance of counsel." *Van Tran*, 864 S.W.2d at 471. Our supreme court, after examining the transcript of Van Tran's interview, concluded that Van Tran's limited ability to speak English did not invalidate his waiver of his constitutional rights. No transcript of the defendant's interview is included in the record, but the record does include the audio recording of the interview. The recording establishes that the defendant spoke in broken English with an accent. He may have occasionally lapsed into Spanish. Nevertheless, the recording indicates that the defendant possessed "the requisite level of comprehension (i.e., that he need not talk, that he could have a lawyer, and that any statements can be used against him)" to waive his rights. *Van Tran*, 864 S.W.2d at 473. Although the defendant's proficiency in the English language was lacking, his command of English allowed him to understand the *Miranda* warnings, and his limited proficiency did not prevent him from making a knowing, voluntary, and intelligent waiver of his constitutional rights.

## II. Sufficiency

The defendant next contends that the evidence was insufficient to support his conviction given the absence of physical evidence tying the defendant to the offense, the incompetence of the defendant's pretrial statement, and the presence of "other explanations" for the victim's injuries. The State avers that the evidence was sufficient.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence,

or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[r]ape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim" if the victim is between the ages of three and 13. T.C.A. § 39-13-522(a). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." *Id.* § 39-13-501(7).

Here, the victim testified that when she was eight years old, the defendant, her mother's live-in boyfriend, penetrated her vagina with his penis, causing her vagina to "pour[] out blood." The victim's mother took the victim to the hospital, where an examination revealed "a traumatic laceration" to the victim's "posterior vaginal fourchette" running "from inside the vagina down around the outside opening into the perineal area." Additionally, the victim's "[h]ymen was torn traumatically," and she had bruising around her vagina "'on either side of'" the laceration. Both Doctor Hamada and Ms. Pickup testified that the victim's injuries were caused by forceful penetration and could not have been caused by a fall or a "straddle" injury. In our view, the evidence presented overwhelmingly established the defendant's sexual penetration of the victim. Although the defendant denied all abuse and questioned the victim's conflicting testimony about penetration, such matters of witness credibility and evidentiary weight are within the exclusive province of the trier of fact, and this court will not reweigh such evidence. *See Dorantes*, 331 S.W.3d at 379.

### III. Sentencing

The defendant asserts that his 27-year sentence is excessive, arguing that the trial court incorrectly applied enhancement factor (6), that the personal injuries inflicted upon the victim were particularly great. The State argues that the sentence was appropriate.

-12-

At the sentencing hearing, Ms. Suarez testified that the victim had been "acting out" as a result of the offense and that the victim had undergone counseling. She said that the victim was "terrified" of the defendant.

The defendant made the following unsworn allocution:

> With all respect, I just wanted to say that the reason I'm asking for deportation is that I've been found guilty at trial. And there really is no other remedy or recourse for me. And that's why I'm just asking you if I could be deported to go back to my country and to my home. The reason for that is I want to go back to my country and never come back to this country and that's really all that I'm asking for. And everything else, really I already said. I testified. You heard that, you have the reports. So really there is nothing else for me to say when you know everything else.

The State asked the trial court to apply enhancement factors 6, that the victim's injuries were particularly great; 7, that the offense was committed to satisfy the defendant's desire for sexual gratification; and 14, that the defendant abused a position of private trust. *See* T.C.A. § 40-35-114(6), (7), (14). The trial court agreed that those factors were arguably applicable to the offense, but the court gave little weight to factor 6 and no weight at all to factors 7 and 14. The court found that the defendant's history of entering the United States illegally, even after he had been deported following a previous criminal conviction, when coupled with the three enhancement factors justified "some enhancement." The court imposed a 27-year sentence, two years more than the minimum sentence provided for the defendant's conviction.

Our standard of review of the trial court's sentencing determinations in this case is whether the trial court abused its discretion, but we apply a "presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 706 n.41 (citing T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is

within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

We need not tarry long over the defendant's claim because, even assuming that the trial court misapplied or failed to apply certain enhancement factors or mitigating factors, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. Nothing in the record suggests that the trial court in this case "wholly departed from" the Sentencing Act. To the contrary, the record reflects that the trial court considered all the relevant principles associated with sentencing, including the enhancement and mitigating factors, when imposing the sentence in this case. Accordingly, we conclude that the record fully supports the length of sentence imposed in this case.

*Conclusion*

Based upon the foregoing analysis, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE

-14-